FILED
United States Court of Appeals
Tenth Circuit

May 9, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RAMAH NAVAJO CHAPTER;
OGLALA SIOUX TRIBE; PUEBLO OF
ZUNI, for themselves and on behalf of a
class of persons similarly situated,

      Plaintiffs–Appellants,

v.

KENNETH SALAZAR, Secretary of the
Interior; LARRY ECHO HAWK,
Assistant Secretary of the Interior; MARY
L. KENDALL, Acting Chief of Office of
Inspector General, U.S. Department of the
Interior[1]; UNITED STATES OF
AMERICA,

      Defendants–Appellees,

and

THE NATIONAL CONGRESS OF
AMERICAN INDIANS,

      Amicus Curiae.

No. 08-2262

---

    [1] Pursuant to Fed. R. App. P. 43(c)(2) Kenneth Salazar is substituted for former Secretary of the Interior, Dirk Kempthorne; Larry Echo Hawk is substituted for former Assistant Secretary of the Interior, Eddie Brown; and Mary L. Kendall is substituted for former Chief of Office of Inspector General, Marvin Pierce.

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:90-CV-00957-LH-KBM)**

Michael Paul Gross, Esq., M. P. Gross Law Firm, P.C., Santa Fe, New Mexico (C. Bryant Rogers, VanAmberg, Rogers, Yepa, Abeita & Gomez, LLP, Santa Fe, New Mexico; and Lloyd Benton Miller, Sonosky, Chambers, Sachse, Miller & Munson, Anchorage, Alaska with him on the briefs) for Plaintiffs-Appellants.

John Samuel Koppel, Appellate Staff, Civil Division (Tony West, Assistant Attorney General; Gregory J. Fouratt, U.S. Attorney; and Barbara C. Biddle, Appellate Staff, Civil Division, with him on the briefs) U.S. Department of Justice, Washington, DC, for Defendants-Appellees.

Geoffrey D. Strommer and Stephen D. Osborne, Hobbs, Straus, Dean & Walker, LLP, Portland, Oregon, and John Dossett, General Counsel, National Congress of American Indians, Washington, D.C., filed an Amicus Curiae brief for National Congress of American Indians, in support of Plaintiffs-Appellants.

Before **LUCERO**, **McKAY**, and **HARTZ**, Circuit Judges.

**LUCERO**, Circuit Judge.

We are faced with an apparent contradiction. Pursuant to the Indian Self-Determination and Education Assistance Act ("ISDA"), the United States enters into self-determination contracts with Indian tribes and tribal organizations "for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law." 25 U.S.C. § 450b(j). These agreements include contract support costs ("CSCs") which are the "reasonable costs for

-2-

activities that must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management," but would not be paid by the Secretary of the Interior if the federal government operated the contracted program directly. § 450j-1(a)(2). Congress has mandated that all self-determination contracts provide full funding of CSCs, see § 450j-1(g), but has nevertheless failed to appropriate funds sufficient to pay all CSCs every year since 1994, instead capping appropriations at a level well below the sum total of CSCs. See, e.g., Dep't of the Interior & Related Agencies Appropriations Act, 1995, Pub. L. No. 103-332, tit. I, 108 Stat. 2499, 2511 (1994).

These funding shortfalls have threatened tribal programs designed to fulfill the congressionally mandated goal of the ISDA to "enhance the progress of Indian people and their communities." 25 U.S.C. § 450(a)(1). Contracts for programs absolutely essential to self-government, such as law enforcement, economic development, and natural resource management, have become "unworkable" in the words of a tribal representative. As a result, several tribes and tribal organizations brought suit seeking to collect the promised, but unappropriated, CSCs.

The government urges us to affirm the district court and resolve the ISDA/appropriations contradiction by holding that the phrase "subject to the availability of appropriations," included in both the ISDA, see § 450j-1(b), and all self-determination contracts, see § 450l(c), unambiguously eliminates the government's obligation to pay CSCs unless Congress appropriates funds to pay all CSCs on every self-determination

contract. Plaintiffs counter that the phrase "subject to the availability of appropriations" must be interpreted from the perspective of the individual contractor, not by reference to all contractors who might lay claim to a given appropriation. In other words, only Congressional funding decisions—not discretionary allocation decisions made by an agency—can render an appropriation unavailable.

Following a recent Supreme Court case addressing a nearly identical issue, we conclude that plaintiffs' interpretation is reasonable. As the Court held in Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. 631 (2005), "if the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment even if the agency has allocated the funds to another purpose or assumes other obligations that exhaust the funds." Id. at 641 (quotation omitted). Following our canon of construction requiring that an act be construed in favor of a reasonable interpretation advanced by a tribe, see Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1462 (10th Cir. 1997), and the ISDA's requirement that contracts be construed in favor of the contractor, 25 U.S.C. § 450*l*(c), we hold that the government remains liable because the annual CSC appropriations were sufficient to cover any individual contract.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's grant of summary judgment in favor the government and remand for further proceedings.

**I**

This appeal comes after nearly two decades of litigation under the ISDA by Ramah Navajo Chapter ("Ramah"). The statutory and administrative landscape provides

an important backdrop for our legal analysis.

## A

Prior to the ISDA, educational and governmental services were provided directly by the federal government to the hundreds of federally recognized tribes in the United States. Acknowledging that "Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people," 25 U.S.C. § 450(a)(1), Congress enacted the ISDA to "permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services," § 450a(b). The ISDA reaffirms the "Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole." § 450a(a). It pursues a goal of Indian "self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities." Id.

Pursuant to the ISDA, the Secretary of the Interior and the Secretary of Health and Human Services are directed to enter into self-determination contracts upon the request of a tribe, provided that the request satisfies several statutory criteria. See §§ 450b(i), 450f(a). The Secretary must provide the amount that the agency "would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract." § 450j-1(a)(1). These contracts effectively transfer responsibility for

-5-

various programs from federal agencies to the tribes themselves, while maintaining federal funding of the programs.

Congress soon recognized that providing only the funds the Secretary would have spent operating a given program created a "serious problem" because those funds do not cover "federally mandated annual single-agency audits, liability insurance, financial management systems, personnel systems, property management and procurement systems and other administrative requirements." S. Rep. No. 100-274, at 8 (1987), reprinted in 1988 U.S.C.C.A.N. 2620, 2627. As a result, tribal resources "which are needed for community and economic development must instead be diverted to pay for the indirect costs associated with programs that are a federal responsibility." Id. at 9, reprinted in 1988 U.S.C.C.A.N. at 2628. Congress accordingly amended the ISDA to require full funding of CSCs. See Indian Self Determination Act Amendments of 1987, Pub. L. No. 100-472, § 205, 102 Stat. 2285, 2292-94 (1988).

CSCs include "direct program expenses for the operation of the Federal program that is the subject of the contract," 25 U.S.C. § 450j-1(a)(3)(A)(i), and "any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract," § 450j-1(a)(3)(A)(ii). The latter category appears to correspond to "indirect costs" which are defined as the "costs incurred for a common or joint purpose benefiting more than one contract objective, or which are not readily assignable to the contract objectives specifically benefited without effort disproportionate to the results

-6-

achieved." § 450b(f). Indirect costs are generally calculated by multiplying the "contract funding base" by the "indirect cost rate," a negotiated figure. See § 450b(b), (g); S. Rep. No. 100-274, at 9, reprinted in 1988 U.S.C.C.A.N. at 2628 ("Tribal indirect cost rates are negotiated and approved according to OMB guidelines by the Department of the Interior Office of Inspector General.").

Under the revised ISDA, CSC funding "shall be added to the amount" the Secretary would have spent on the program subject to a self-determination contract. 25 U.S.C. § 450j-1(a)(2) (emphasis added). Another section of the ISDA provides that "[u]pon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under [§ 450j-1(a)]." § 450j-1(g) (emphasis added). However, the ISDA twice states that entitlement to self-determination contract funding is "subject to the availability of appropriations." §§ 450j(c)(1), 450j-1(b). It further provides that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this [Act]." § 450j-1(b).

The phrase "subject to the availability of appropriations" has become highly significant because of Congress' ISDA funding decisions. In 1994, Congress began capping CSC funding. The 1994 appropriations act for the Department of the Interior allocated nearly $1.5 billion to the Bureau of Indian Affairs ("BIA"), but provided that "not to exceed $91,223,000 of the funds in this Act shall be available for payments to tribes and tribal organizations for indirect costs associated with contracts or grants or

-7-

compacts authorized by the Indian Self-Determination Act." Dep't of the Interior & Related Agencies Appropriations Act, 1994, Pub. L. No. 103-138, tit. I, 107 Stat. 1379, 1390-91 (1993). The Conference Report on the appropriations bill suggested Congress was apprehensive about the growth of CSCs:

> The managers remain very concerned about the continued growth in contract support costs, and caution that it is unlikely that large increases for this activity will be available in future years' budgets. It is also a concern that significant increases in contract support will make future increases in tribal programs difficult to achieve.

H.R. Conf. Rep. No. 103-299, at 28 (1993). A Senate Report accompanying the following year's appropriations act noted "that significant shortfalls exist for fiscal year 1994 contract support funding," but advised that the "shortfalls should be treated as one-time occurrences and should not have any impact on determining future indirect cost rates." S. Rep. No. 103-294, at 57 (1994).

Despite this expectation, funding shortfalls for CSCs were repeated every fiscal year from 1994 to 2001. Later appropriations acts, usually passed at the beginning of the fiscal year, used the phrase "contract support costs" rather than "indirect costs," but each included the same "not to exceed" language. See tit. I, 108 Stat. at 2511; Omnibus Consol. Rescissions & Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1321-170 (1996); Omnibus Consol. Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-192 (1996); Dep't of the Interior & Related Agencies Appropriations Act, 1998, Pub. L. No. 105-83, tit. I, 111 Stat. 1543, 1554 (1997); Omnibus Consol. & Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat.

2681, 2681-245 (1998); Consol. Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501, 1501A-148 (1999); Dep't of the Interior & Related Agencies Appropriations Act, 2001, Pub. L. No. 106-291, tit. I, 114 Stat. 922, 934 (2000).

**B**

Following the passage of each appropriations act, the BIA issued a notice in the Federal Register discussing the CSC shortfalls. The 1994 notice warned of "a shortfall of at least $ 10,000,000 in FY 1994 and possibly a shortfall as high as $ 25,000,000." Distribution of Fiscal Year 1994 Contract Support Funds, 58 Fed. Reg. 68,694, 68,694 (Dec. 28, 1993). It also reminded tribal contractors that the BIA "can only utilize the amount appropriated for the [CSC] account to meet indirect cost needs." Id. Because of the projected shortfall, the BIA requested "a report showing the amounts provided to cover prior year shortfalls, the amounts and percentages funded for current year contracts and a revised detailed need request" from each area office. Id. The agency hoped to provide instructions "advising each area of the level to be applied to each contract," around May 1, 1994. Id.

Notices published for subsequent years similarly requested interim reports on CSC need at some point during the operative fiscal year. After receiving the reports, and well into the fiscal year for which funding was provided, the BIA would calculate the amount of the shortfall and provide CSC funding on a uniform, pro-rata basis. See Distribution of Fiscal Year 1995 Contract Support Funds, 59 Fed. Reg. 55,318 (Nov. 4, 1994);

-9-

Distribution of Fiscal Year 1996 Contract Support Funds, 61 Fed. Reg. 16,106 (Apr. 11, 1996); Distribution of Fiscal Year 1997 Contract Support Funds, 62 Fed. Reg. 1468 (Jan. 10, 1997); Distribution of Fiscal Year 1998 Contract Support Funds, 63 Fed. Reg. 5398 (Feb. 2, 1998); Distribution of Fiscal Year 1999 Contract Support Funds, 64 Fed. Reg. 2658 (Jan. 15, 1999); Distribution of Fiscal Year 2000 Contract Support Funds, 65 Fed. Reg. 10,100 (Feb. 25, 2000); Distribution of Fiscal Year 2001 Contract Support Funds, 66 Fed. Reg. 15,275 (Mar. 16, 2001).

The Department of Interior appropriation for fiscal year 1995, for example, was passed on September 30, 1994, the last day of fiscal year 1994. The BIA requested initial reports of CSC need by December 1, 1994. Distribution of Fiscal Year 1995 Contract Support Funds, 59 Fed. Reg. 55,318 (Nov. 4, 1994). After receiving these initial reports, the BIA disbursed 75 percent of the total amount reported. Id. It requested a second set of reports by July 10, 1995, and planned a final distribution of the remainder of CSC funds well into the fiscal year—"on or about July 31, 1995 [ten months into the fiscal year], on the basis of these reports." Id. "If the reports indicate that [the appropriated sum] will not be sufficient to cover the entire need, this amount will be distributed so that all offices receive the same percentage of their reported need for distribution at this same percentage." Id. The BIA funded 91.74 percent of the actual CSCs on each self-determination contract in fiscal year 1995. Between 1994 and 2004, the CSC funding rate ranged from 77 to 93 percent for each fiscal year.

**C**

Plaintiffs Ramah and the Oglala Sioux Tribe ("Oglala") are parties to long-term "mature" self-determination contracts of indefinite duration with the United States pursuant to the ISDA. See 25 U.S.C. § 450b(h). Like all self-determination contracts, plaintiffs' agreements expressly incorporate the ISDA. They further provide that the ISDA and "each provision of this contract shall be liberally construed for the benefit of the contractor." A section titled "FUNDING AMOUNT" states:

> Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference in subsection (f)(2). Such amount shall not be less than the applicable amount determined pursuant to section 106(a) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j-1).

The annual funding agreements ("AFAs"), incorporated by reference in the mature contracts, describe attachments containing "terms that identify the programs, services, functions, and activities to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment." As their name implies, AFAs are renegotiated each year. Like the main self-determination contracts, AFAs include language discussing the availability of appropriations.

Ramah's 2000 AFA[2] sets out "Tentative FY 2000 Funding" for various programs and activities "using FY 99 funding levels." The AFA also uses a tentative indirect cost rate, adopting the last rate approved by the Office of Inspector General, which occurred

---

[2] Oglala's AFAs are substantially similar.

in calendar year 1998.[3]  The AFA explains:

>   Indirect Cost rate[s] for Calendar Year 1999 and 2000 have not been completed yet with the Office of Inspector General.  As of the date of submittal of this AFA, neither has the Chapter completed its Calendar Year 2000 Indirect Cost proposal.  The last approved IDC rate was for CY 1998 at 86.4%.  Based on this last approved rate, Ramah Navajo Chapter requests that the CY 1998 IDC negotiated final rate be used to temporarily fund IDC at 100% level.  NOTE*:  (Funding of the amount shall be subject to the availability of appropriation. . . .).  As soon as funding has been appropriated and sub-allotted to the Ramah Navajo Agency, funds will be added to the AFA.

>   (i)      Direct Contract Support Costs are to be negotiated within the first ninety, (90) days of the new contract term and shall be funded from the BIA's Indian Self-Determination Fund as soon as resources can be made available, but not later than September 30, 2000.  The Contractor reserves the right to annually renegotiate its need for Direct Contract Support Costs in accordance with Sec. 106(a)(3)(B) of the Act [25 U.S.C. § 450j-1(a)(3)(B)].  Funding of the amount needed shall be subject to the availability of appropriations.

>   (ii)      Outstanding Indirect Cost issues from past fiscal years which Ramah Navajo Chapter has not received will be subject to continuing discussion until resolved.

>   . . . .

>   . . . Funding for additional contract support costs shall be added to the AFA for the Contractor which includes Indian Self-Determination Fund direct and indirect type costs.  The amount of Indirect Cost Funding shall be based upon the Contractor's Indirect Cost Agreement which is applicable to this period of performance.

---

[3] The indirect cost rate is distinct from the CSC funding rate.  One, the indirect cost rate, is multiplied by the non-CSC contract amount to reach an estimate of indirect cost CSCs.  See Cherokee, 543 U.S. at 635.  The other, the CSC funding rate, is the percentage of total CSC need for which Congress actually appropriated funds.

As these provisions make clear, Ramah faced two levels of uncertainty at the time it entered into the AFA. First, the indirect cost rate was subject to negotiation and approval by the Office of Inspector General, meaning that the amount of the contract was undetermined. Second, even after the amount of the AFA was finalized, the actual payment forthcoming from the BIA was unknown because the agency did not determine the CSC funding rate until the fiscal year was well underway. Ramah did not receive notice of the exact amount of contract funding until the last month of each fiscal year. As an accounting consultant to Ramah and Oglala describes it, this system "allowed one party to the contract, the government, to set the price after the service has been performed by the other party."

**D**

Ramah originally brought this class action in 1991 seeking to alter the manner in which the BIA calculated indirect cost rates. After this court held in favor of plaintiffs, see Ramah Navajo Chapter, 112 F.3d at 1455, the parties entered into several partial settlement agreements, see Ramah Navajo Chapter v. Norton, 250 F. Supp. 2d 1303 (D.N.M. 2002); Ramah Navajo Chapter v. Babbitt, 50 F. Supp. 2d 1091 (D.N.M. 1999). During these settlement negotiations, Oglala intervened as plaintiffs. The Pueblo of Zuni also intervened later in the proceedings.

This appeal arises from a motion for summary judgment filed by plaintiffs in February 2000, seeking a declaration that they are entitled to unpaid CSCs from fiscal year 1994 forward. Plaintiffs sought relief pursuant to the Contract Disputes Act, 41

-13-

U.S.C. §§ 601-13, after exhausting their administrative remedies. See 25 U.S.C. § 450m-1(d). The government cross-moved for summary judgment, contending that its CSC obligation was dependent upon Congress appropriating funds sufficient to pay CSCs on every self-determination contract. These competing cross-motions were stayed pending the outcome of Cherokee Nation of Oklahoma v. Thompson, 311 F.3d 1054 (10th Cir. 2002), rev'd sub nom. Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. 631 (2005).

After receiving supplementary briefing on the impact of Cherokee, the district court granted the government's motion. It held that "the United States is not liable for shortfalls in contract payments when Congress has specified an insufficient 'not to exceed' lump sum appropriation." Plaintiffs timely appealed.

**II**

We review the grant of summary judgment de novo. Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000). A party is entitled to summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law. Id.

**A**

In construing the statute at issue, we begin with its plain text. See Chickasaw Nation v. United States, 208 F.3d 871, 876 (10th Cir. 2000). "If the terms of the statute are clear and unambiguous, they are controlling absent rare and exceptional circumstances." Id. "We also take into account the broader context of the statute as a

-14-

whole when ascertaining the meaning of a particular provision." Conrad v. Phone Directories Co., 585 F.3d 1376, 1381 (10th Cir. 2009) (quotation omitted).

If a statute is ambiguous, we "look to traditional canons of statutory construction to inform our interpretation." Id. (citation omitted). One such canon is particularly important in this case: In deciding between two reasonable interpretations, "the canon of construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes. . . . The result, then, is that if the [Act] can reasonably be construed as the Tribe would have it construed, it must be construed that way." Ramah Navajo Chapter, 112 F.3d at 1462 (quotation and citations omitted). This canon, grounded in the trust relationship between the federal government and Indian tribes, applies with equal force to interpretations of contracts. See Felix S. Cohen, Handbook of Federal Indian Law 224-25 (1982 ed.) ("Statutes, agreements, and executive orders dealing with Indian affairs have been construed liberally in favor of establishing Indian rights. . . . These canons play an essential role in implementing the trust relationship between the United States and Indian tribes . . . ."). The ISDA, its legislative history, and the self-determination contracts at issue confirm the applicability of this canon to the present dispute. See 25 U.S.C. § 450*l*(c) (terms of model agreement included in all self-determination contracts provide that "each provision of the [ISDA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor" (model agreement § (a)(2))); S. Rep. No. 100-274, at 3 reprinted in 1988 U.S.C.C.A.N. at 2622 ("[F]ederal action toward Indians as expressed in treaties,

-15-

agreements statutes, executive orders, and administrative regulations is construed in light of the trust responsibility.").

**B**

We are presented with competing interpretations of the phrase "subject to the availability of appropriations." The government argues that the phrase unambiguously limits the plaintiffs' entitlement to CSC funding to a pro rata share determined by multiplying individual CSC need by the ratio of total CSC appropriations to total CSC need. Plaintiffs contend that "availability" refers to the ability of the government to pay a particular tribe's CSCs, not its ability to pay all tribes' CSCs. Under this construction, the phrase voids the government's obligation on a given contract only if Congress fails to appropriate enough funds to pay that particular contract. In essence, the dispute asks whether we must take into account the Secretary's discretionary funding of other contractors in determining whether the appropriation is "available" for a particular contract.

The terms of the ISDA and the contracts do not definitively answer this question. The phrase "subject to the availability of appropriations" could refer, as the government urges, to whether Congress has appropriated sufficient funds to pay the aggregate of hundreds of self-determination contracts. This formulation would require a court to await an agency's allocation of an appropriation before determining whether funds are available. However, the phrase could also refer, as the tribes contend, to a limitation on an individual contract without reference to other self-determination contracts.

-16-

Fortunately, although the statutory and contractual language does not dictate one party's position over the other, we do not write on a blank slate.

## III

We begin with three principles set down by the Supreme Court. First, a "fundamental principle of appropriations law is that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions." Lincoln v. Vigil, 508 U.S. 182, 192 (1993) (quotation omitted). Second, there is no merit to the "claim that, because of mutual self-awareness among tribal contractors, tribes, not the Government, should bear the risk that an unrestricted lump-sum appropriation would prove insufficient to pay all contractors." Cherokee, 543 U.S. at 640 (citation omitted). Third, "if the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment even if the agency has allocated the funds to another purpose or assumes other obligations that exhaust the funds." Id. at 641 (quotation omitted).

## A

The first principle relevant to this dispute is that of unfettered agency discretion in distributing appropriations. "A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit." Lincoln, 508 U.S. at 192 (quoting Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan, 746 F.2d 855, 861 (D.C.

-17-

Cir. 1984)).  Although an agency may create ill will by ignoring congressional intent as expressed in legislative history, "[a]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, . . . the decision to allocate funds is committed to agency discretion by law." Lincoln, 508 U.S. at 193 (quotation omitted).

The Court's discussion of "permissible statutory objectives," id., implicates the concept of legal availability.  In In re LTV Aerospace Corp., 55 Comp. Gen. 307 (1975), the Comptroller General explained the rule later adopted explicitly by the Lincoln Court, see 508 U.S. at 192, 193, by reference to this concept:

> If the Congress desires to restrict the availability of a particular appropriation . . . , such control may be effected by limiting such items in the appropriation act itself. . . .  In the absence of such limitations an agency's lump sum appropriation is legally available to carry out the functions of the agency.

In re LTV Aerospace Corp., 55 Comp. Gen. at 319.[4]

The General Accounting Office describes "legal availability" as follows:

[D]ecisions are often stated in terms of whether appropriated funds are or are not "legally available" for a given obligation or expenditure.  This is simply another way of saying that a given item is or is not a legal expenditure.  Whether appropriated funds are legally available for something depends on three things:

1. the purpose of the obligation or expenditure must be authorized;

2. the obligation must occur within the time limits applicable to the

---

[4] Comptroller General opinions are not binding, but provide "expert opinions, which we should prudently consider." Cherokee Nation, 334 F.3d at 1084 (quotation omitted).

appropriation; and

3. the obligation and expenditure must be within the amounts Congress has established.

1 U.S. Gen. Accounting Office, Principles of Federal Appropriations Law 4-6 (3d ed. 2004) (the "GAO Redbook").[5]

The import of <u>Lincoln</u> to the case at bar is that the Secretary was free to disburse the funds appropriated by Congress in any manner the Secretary chose, provided that the funds were legally available for the expenditures chosen. Thus, for example, the Secretary could have provided CSC funding on a first-come, first-served basis, covering the entire CSC need for those tribes and tribal organizations with the oldest contracts. Similarly, the Secretary could have selected those contracts that covered the most essential services and paid full CSC need to those contractors. And of course, the Secretary's chosen course of action, disbursing a pro-rata share to all contractors, was permissible because the funds were legally available to be used on CSCs.

We recognize that a divided panel of the D.C. Circuit ruled that the ISDA requires pro-rata funding in the event of limited appropriations. <u>See</u> <u>Ramah Navajo School Board v. Babbitt</u>, 87 F.3d 1338, 1349 (D.C. Cir. 1996). Although the panel majority is

---

[5] Like Comptroller General opinions, the GAO Redbook is not binding but offers persuasive agency analysis. <u>See</u> <u>Star-Glo Assocs., LP v. United States</u>, 414 F.3d 1349, 1354 (Fed. Cir. 2005) ("In considering the effect of appropriations language both the Supreme Court and this court have recognized that the General Accounting Office's publication, Principles of Federal Appropriations Law (hereinafter the 'GAO Redbook') provides significant guidance." (citations omitted)).

somewhat opaque, it appears to hold that pro rata distribution is required because full funding of individual CSCs is mandated when Congress appropriates enough funds to cover all contracts. See id. at 1348 ("[T]he Act informs the Secretary exactly how the full funding should be allocated, and that method provides a meaningful standard by which to review the Secretary's dissemination of the insufficient funds as well."). We are not persuaded by this reasoning.

The ISDA text simply states that "[t]he Secretary shall add to the contract the full amount of" CSCs, and that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization." 25 U.S.C. § 450j-1(b), (g). To hold that these provisions unambiguously require pro rata funding if Congress fails to provide enough money to pay all CSCs stretches the statutory text far beyond its breaking point. Although a pro rata distribution is attractive as a Solomonic solution to the problem of a statutory mandate and budgetary limitations, viewing it as a requirement runs afoul of Lincoln. See 508 U.S. at 193.

The dissent in Ramah Navajo School Board provides a far more compelling treatment of the issue. It cites Lincoln for the proposition that "requiring close adherence to a 'formula' is flatly improper where the Secretary has express statutory discretion over the allocation of a fund." Ramah Navajo Sch. Bd., 87 F.3d at 1355 (Silberman, J., dissenting). Because the ISDA provides no statutory guidance in the event that appropriations fall below total CSC need, Lincoln stands for the proposition that the Secretary has "unreviewable discretion" in allocating the funds. Ramah Navajo Sch. Bd.,

87 F.3d at 1355 (Silberman, J., dissenting). With respect to 25 U.S.C. § 450j-1(b), which states that the Secretary is not required to reduce funding to one tribe to pay another, the dissent points out that the Secretary <u>necessarily</u> takes from one tribe to pay another whenever funding falls short of total need regardless of the selected allocation method. "Obviously, anytime the Secretary is asked to increase his proposed funding for one or more tribes out of a limited appropriation, he necessarily must reduce funding for the rest. There is no escaping the zero sum game." <u>Ramah Navajo Sch. Bd.</u>, 87 F.3d at 1354 (Silberman, J., dissenting).

We agree with the <u>Ramah Navajo School Board</u> dissent: "the Secretary is under no legal obligation in the event of a shortfall to meet any particular ratio of distribution among the tribes." <u>Id.</u> at 1353(Silberman, J., dissenting).

**B**

The second concept key to our disposition can be simply stated, but is too easily ignored: The tribes and tribal contractors with ISDA contracts are independent entities with independent rights and entitlements. There are over 600 tribes and tribal entities with self-determination contracts, ranging from small Alaskan villages to the immense Navajo Nation, and including tribal consortiums such as the Great Lakes Indian Fish and Wildlife Commission. They are not a single conglomerated entity simply because each lays claim to a portion of the same appropriation any more than all federal highway contractors represent a single, undifferentiated mass.

In <u>Cherokee</u>, the Supreme Court roundly rejected the government's "claim that,

-21-

because of mutual self-awareness among tribal contractors, tribes, not the Government, should bear the risk that an unrestricted lump-sum appropriation would prove insufficient to pay all contractors." Cherokee, 543 U.S. at 640 (citation omitted). In rejecting this argument, the Court cited Ferris v. United States, 27 Ct. Cl. 542 (1892), a venerable Court of Claims opinion which sets forth the traditional rule regarding the effect of insufficient appropriations:

> A contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects. An appropriation per se merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties.

Id. at 546 (citing Dougherty v. United States, 18 Ct. Cl. 496 (1883)). Dougherty, the case upon which Ferris relies, explained the salient distinction between multi-contract appropriations and single-contract appropriations:

> [W]hen one contract on its face assumes to provide for the execution of all the work authorized by an appropriation, the contractor is bound to know the amount of the appropriation, and cannot recover beyond it; but we have never held that persons contracting with the Government for partial service under general appropriations are bound to know the condition of the appropriation account at the Treasury or on the contract book of the Department. To do so might block the wheels of the Government. The statutory restraints in this respect apply to the official, but they do not affect the rights in this court of the citizen honestly contracting with the Government.

Dougherty, 18 Ct. Cl. at 503 (citation omitted).

The distinction identified in Dougherty remains valid; we now generally refer to

-22-

appropriations as falling into one of two categories:  line-item or lump-sum.  "A <u>lump-sum appropriation</u> is one that is made to cover a number of specific programs, projects, or items.  (The number may be as small as two.)  In contrast, a <u>line-item appropriation</u> is available only for the specific object described."  2 GAO Redbook at 6-5; <u>see also</u> <u>id.</u> at 6-6 ("[A] lump-sum appropriation is simply one that is available for more than one specific object.").

It may be tempting to consider all tribes' claims to an appropriation collectively, to view tribal self-determination contract funds as a single line-item appropriation, and to assume that because funds were insufficient to pay all tribal contractors they were unavailable to each contractor, but <u>Cherokee</u>, <u>Ferris</u>, and <u>Dougherty</u> prohibit such analytical shortcuts.

## C

Finally, we must consider <u>Cherokee</u>'s guidance that "if the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment even if the agency has allocated the funds to another purpose or assumes other obligations that exhaust the funds."  543 U.S. at 641 (quotation omitted).

In <u>Cherokee</u>, the Court considered an issue nearly identical to that under review:  the <u>Cherokee</u> plaintiffs sought to collect CSC payments for contracts funded by appropriations that lacked an annual cap.  The government took the position that "it is legally bound by its promises if, and only if, Congress appropriated sufficient funds, and that, in this instance, Congress failed to do so."  543 U.S. at 636.  Plaintiffs countered that

"as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations.'" Id. at 637. This is true, they argued, "even if the contract uses language such as 'subject to the availability of appropriations,' and even if an agency's total lump-sum appropriation is insufficient to pay all the contracts the agency has made." Id.

The Court agreed with plaintiffs, quoting the Ferris rule. Cherokee, 543 U.S. at 637-38 (quoting Ferris, 27 Ct. Cl. at 546). It noted that the ISDA "reflects a congressional concern with Government's past failure adequately to reimburse tribes' indirect administrative costs and a congressional decision to require payment of those costs in the future." Cherokee, 543 U.S. at 639. Turning to the "subject to the availability of appropriations" language, the Court stated:

> Language of this kind is often used with respect to Government contracts. This kind of language normally makes clear that an agency and a contracting party can negotiate a contract prior to the beginning of a fiscal year but that the contract will not become binding unless and until Congress appropriates funds for that year. It also makes clear that a Government contracting officer lacks any special statutory authority needed to bind the Government without regard to the availability of appropriations.

Id. at 643 (citations omitted).

Relying on Ferris, the Court held that the "subject to the availability of appropriations" language did not help the government "[s]ince congress appropriated adequate unrestricted funds here." Cherokee, 543 U.S. at 643. It rejected the government's argument that appropriations were "unavailable to pay contract support

-24-

costs because the Government had to use those funds to satisfy . . . the costs of inherent federal functions, such as the cost of running the Indian Health Service's central Washington office." Id. at 641-42 (quotation omitted). "This argument cannot help the Government," the Court determined, "for it amounts to no more than a claim that the agency has allocated the funds to another purpose, albeit potentially a very important purpose." Id. at 642.

Cherokee accordingly held that an agency's decision to allocate legally available funds to some other permissible purpose does not render an appropriation unavailable with respect to an ISDA contract.

**IV**

In light of the foregoing principles, there are two potential interpretations of the effect of the "subject to the availability of appropriations" proviso. The first option would be to hold that funds are unavailable to an individual ISDA contractor because the Secretary spent to the CSC cap. In other words, the availability of appropriations would be determined after the Secretary, under his discretion, allocated CSC appropriations, and thus availability would turn on the Secretary's decisions. Under this interpretation, as long as the Secretary spends to the CSC cap, the Secretary may determine whether and to what extent the appropriation is available for each individual contractor.

Our second option would be to hold that the availability of appropriations to fund a specific contract must be determined without reference to the Secretary's discretionary allocation. If an appropriation is legally available to fund a particular contract, then the

-25-

"subject to the availability of appropriations" condition is satisfied with respect to that contract. On this reading, each tribe is bound only by congressional funding choices as to its contract, not by the Secretary's allocation choices.

We conclude that the latter interpretation is reasonable and most consistent with Cherokee.

## A

The appropriations at issue in Cherokee and those under consideration in this case share important characteristics. First, they are lump-sum appropriations because they were "made to cover a number of specific programs, projects, or items." 2 GAO Redbook at 6-5. As the GAO Redbook discusses, the Comptroller General has applied this interpretation of "lump-sum" even when an appropriation covers only two, closely-related items.[6] The key legal principle applicable to lump-sum appropriations is that "as

---

[6] In Newport News Shipbuilding & Dry Dock Co., 55 Comp. Gen. 812 (1976), the Comptroller General concluded that an appropriation covering expenditures for only two ships constituted a lump-sum expenditure. Id. at 821-22. According to the GAO,

> [t]he terms "lump-sum" and "line-item" are relative concepts. The $244 million appropriation in the Newport News case could be viewed as a line-item appropriation in relation to the broader "Shipbuilding and Conversion" category, but it was also a lump-sum appropriation in relation to the two specific vessels included. This factual distinction does not affect the applicable legal principle.

Continued . . .

long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives," federal law "gives the courts no leave to intrude. To that extent, the decision to allocate funds is committed to agency discretion by law." Lincoln, 508 U.S. at 193 (quotations and alteration omitted). In Cherokee, the lump-sum appropriation included the entire budget for the Department of the Interior; in this case, it includes the CSCs for more than 600 contracts.

Second, although the appropriations under consideration in this case explicitly cap a category of spending (CSCs), the appropriations at issue in Cherokee did the same. Unlike the "not to exceed" language regarding CSCs, e.g., tit. I, 108 Stat. at 2511, the appropriations considered in Cherokee provided that a certain amount was appropriated "[f]or expenses necessary to carry out" various programs, e.g., tit. II, 107 Stat. at 1408. But in both instances, the legal effect of the language is to cap appropriations for the authorized expenditures at a certain level. "Words like 'not more than' or 'not to exceed' are not the only ways to establish a maximum limitation. If the appropriation includes a specific amount for a particular object (such as 'for renovation of office space, $100,000'), then the appropriation establishes a maximum that may not be exceeded." 2 GAO Redbook 6-29 (citing 36 Comp. Gen. 526 (1957); 19 Comp. Gen. 892 (1940); 16 Comp. Gen. 282 (1936)).

Third, with respect to the availability of the appropriations, the government argues

2 GAO Redbook at 6-15 (emphasis added).

as it did in <u>Cherokee</u> that the appropriation is not available because the funds were exhausted by other objects for which the appropriation was legally available. In <u>Cherokee</u> the government claimed that it could not pay full CSC need to the Shoshone-Paiute and Cherokee Nation because "the costs of inherent federal functions, such as the cost of running the Indian Health Service's central Washington office," 543 U.S. at 641-42 (quotation omitted), had consumed the appropriation. In the present case, the government contends it cannot pay full CSC need to Ramah, Oglala, and Pueblo of Zuni because CSC payments to other tribes have used up the entire appropriation.

But the Supreme Court rejected this argument in <u>Cherokee</u>, deeming the government's position "no more than a claim that the agency has allocated the funds to another purpose, albeit potentially a very important purpose." <u>Id.</u> at 642. As the Court made clear, "if the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment even if the agency has allocated the funds to another purpose or assumes other obligations that exhaust the funds." <u>Id.</u> at 641 (quotation omitted).

The government does not advance a compelling argument suggesting the result in this case must be different. It notes that Congress capped <u>total</u> CSC spending, but this does not explain why Ramah, Oglala, Pueblo of Zuni, or any one contractor could not be paid full CSC need. In <u>Cherokee</u>, the Court rejected the argument that the Secretary's discretionary allocation of funding for objects for which an appropriation was legally available rendered the appropriation unavailable for other objects. <u>See</u> 543 U.S. at 641.

-28-

Yet that is precisely the argument advanced by the government. In both instances, the government claims that an appropriation is unavailable for a particular plaintiff's contract because the Secretary used the funds on other permissible expenditures.[7] The other expenditures at issue in Ramah were less similar to the plaintiffs' contracts than the other expenditures in this case. But nothing in Cherokee suggests that the similarity between two objects for which an appropriation is legally available controls the issue under consideration, nor do we see a basis in logic for treating such similarity as dispositive.[8] The government focuses on the Cherokee Court's use of the term "unrestricted appropriation," but we read this phrase as referring to restrictions that would render funds legally unavailable to pay the plaintiff's specific contracts. In this case, as in Cherokee,

_____

[7] Although, in contrast to Cherokee, the other permissible expenditures in this case are also statutorily mandated, see 25 U.S.C. § 450j-1(a)(2), the government cannot escape liability for one mandatory expenditure by appealing to its obligation to pay another without rendering the term "mandatory" meaningless.

[8] Although the dissent takes issue with our interpretation of Cherokee, it does not provide a meaningful distinction between the present situation and that considered by the Supreme Court in that case. (See Dissenting Op. 32-36.) It notes that the appropriations here are insufficient to cover all ISDA contracts, but the funds in Cherokee were similarly insufficient to cover all objects for which the appropriation was available.

The dissent suggests that our interpretation must be incorrect because the Cherokee Court might have avoided some of the government's arguments more easily otherwise. (Dissenting Op. 33.) But the Court's selection of one doctrinal path does not lend itself to the inference that all other paths to the same result are infirm. "The authority of the case cannot properly be overthrown by showing, even if it could be shown, that the court might have reached the same result upon some other ground than that which in truth it adopted as the basis of its decision." Union Tank Line Co. v. Wright, 249 U.S. 275, 293 (1919) (Pitney, J., dissenting); see also United States v. Mitchell, 271 U.S. 9, 14 (1926) ("It is not to be thought that a question not raised by counsel or discussed in the opinion of the court has been decided merely because it existed in the record and might have been raised and considered.").

there is no statutory restriction that would preclude the Secretary from using appropriated funds to pay full CSC need to the individual contractors bringing suit.

The government also cites the ISDA's language that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this [Act]." § 450j-1(b). But as discussed in Section III.A, supra, the Secretary always reduces funding from one tribe to pay another when appropriations fall short of total CSC need. Under the present pro rata system, each tribe's CSC funding is reduced by a certain percentage and made available to other tribes. The appropriations acts under consideration plainly required such reductions regardless of the discretionary decisions made by the Secretary. "There is no escaping the zero sum game." Ramah Navajo Sch. Bd., 87 F.3d at 1354 (Silberman, J., dissenting).[9]

At base, the government's argument rests on an improper conflation of over 600 tribes and tribal contractors into one amalgamated contractor. For example, it argues that "in the face of a congressionally-capped appropriation, the agency simply could not lawfully pay plaintiffs the full amount of their CSCs." But this is incorrect. The Secretary possessed the discretion to pay any individual plaintiffs full CSC need. For example, in fiscal year 1998, Congress appropriated "not to exceed $105,829,000" for

_____

[9] Although the dissent relies on this provision for its contrary interpretation, it does not grapple with the fact that § 450j-1(b) is necessarily violated whenever Congress appropriates less than total CSC need. (See Dissenting Op. 32-33.)

CSCs.  Tit. I, 111 Stat. at 1554.  The largest individual CSC entitlement that year was less than $14 million, and the second largest was under $4 million.  It appears the government is relying on the fact that the appropriations were insufficient to pay all contractors, but as Cherokee held, there is no merit to the "claim that, because of mutual self-awareness among tribal contractors, tribes, not the Government, should bear the risk that an unrestricted lump-sum appropriation would prove insufficient to pay all contractors." 543 U.S. at 640 (citation omitted).

Ferris and Dougherty provide a bright-line formula that avoids uncertainty in government contracting:  If more than one contractor is covered by an appropriation, the failure to appropriate funds sufficient to pay all such contractors does not relieve the government of liability.  As Dougherty held, determining whether liability attaches based on such unfettered discretion in the disbursing agent sows uncertainty among contractors that could "block the wheels of the Government."  18 Ct. Cl. at 503.  Instead of considering the discretionary actions of the disbursing agency, the availability of appropriations is determined by congressional action.  As the Supreme Court explained in Cherokee, by signing contracts "subject to the availability of appropriations," the tribes agreed "that the contract will not become binding unless and until Congress appropriates funds for that year."  543 U.S. at 643 (emphasis added).  In other words, the tribes agreed to be bound by congressional funding choices.  But government contractors do not agree to be bound by the allocation choices of the disbursing agency or the contracts formed with other tribes and tribal entities

-31-

No case cited by the government contravenes the Ferris/Dougherty doctrine. Although the government relies upon several cases in which the government escaped liability, each involved a single-contract appropriation. See Sutton v. United States, 256 U.S. 575, 577-79 (1921) ($20,000 appropriation for a specific dredging project proved insufficient to pay the sole contractor); Bradley v. United States, 98 U.S. 104, 111-12 (1878) (line-item appropriation to pay lease for a post office); Shipman v. United States, 18 Ct. Cl. 138, 146 (1883) (single contractor appropriation for a road project which specified "that the work to be done and the materials to be furnished under this agreement shall be restricted to the amount allowed by Congress for this purpose" (emphasis omitted)).

We are also cognizant of the close parallel between the plaintiffs' interpretation of the phrase "subject to the availability of appropriations," and the well-established concept of legal availability. See 1 GAO Redbook at 4-6. Legal availability does not depend on the appropriation of funds sufficient to cover all similar expenditures. The GAO Redbook does not ask whether total obligations and expenditures are within congressionally established limits, it asks whether "the obligation and expenditure" at issue is "within the amounts Congress has established." Id. The Court's acceptance of the Cherokee Nation's understanding of appropriations law strongly supports this construction: "as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations,' even if the contract uses language such as

-32-

'subject to the availability of appropriations.'" Cherokee, 543 U.S. at 637 (emphasis added).

Newport News illustrates this point. That case considered the amount that was legally available for construction of a certain ship, the DLGN 41. The Navy requested $152.3 million for the ship, and $92 million for a second ship, the DLGN 42. Newport News, 55 Comp. Gen. at 816. Congress appropriated the full amount, $244.3 million, without specifying the breakdown between the two ships. Id. The Navy subsequently authorized an expenditure of $30.4 for the DLGN 42. Id. Despite the apparent intent of subdividing the expenditure between the two ships, and the fact that the Navy had already authorized a portion of the funds to be used on the DLGN 42, the Comptroller General held that the entire $244.3 million was legally available for the DLGN 41. Id. at 821.

This result could not have occurred if the concept of legal availability depended on the sufficiency of an appropriation to cover all expenditures authorized by it; money spent on the DLGN 42 obviously cannot also be spent on the DLGN 41. But the federal courts have consistently guarded the integrity of the federal contracting system by holding that the insufficiency of a multi-contract appropriation to pay all contracts does not relieve the government of liability if the appropriation is sufficient to cover an individual contract. See Ferris, 27 Ct. Cl. at 546; Dougherty, 18 Ct. Cl. at 503.

**B**

The Federal Circuit, recently considering the same issue we confront, concluded that a plaintiff in the same position as Ramah, the Arctic Slope Native Association

("ASNA"), could not recover unpaid CSCs because the "availability of funds provision coupled with the 'not to exceed' language limits the Secretary's obligation to the tribes to the appropriated amount." Arctic Slope Native Ass'n v. Sebelius, 629 F.3d 1296 (Fed. Cir. 2010).[10] The court recognized the plaintiff's argument that the government's liability remained "because the total appropriation is sufficient to satisfy the obligation to the [plaintiff], even though insufficient to satisfy the combined obligations to all the tribes," id. at 1303, but as the foregoing quote demonstrates, it nevertheless analyzed the issue as the Secretary's ability to pay all contractors, discussing only the "Secretary's obligation to the tribes," id. at 1304 (emphasis added).

Rather than answering the question of whether the availability of appropriations must be considered from the perspective of individual tribes and tribal contractors, the Federal Circuit's analysis presumes from the outset that the answer is no. The court distinguishes Cherokee on the ground that "here there is a statutory cap and no ability to reallocate funds." Arctic Slope Native Ass'n, 629 F.3d at 1304. But this assertion only begs the question. Although it is true that the Secretary cannot reprogram funds from a more general appropriation once the CSC funding cap is reached, it is equally true that the Secretary was empowered to fund all of ASNA's CSCs by reallocating away from other contractors. In the same vein, the court concluded that the appropriations were not available to ASNA because "the appropriated amount has been paid to the tribes." Id.

---

[10] Following publication of this opinion, we requested supplemental briefing from the parties.

But ASNA's full CSC need was legally available to be paid from the relevant appropriations. Whether those funds were paid to "the tribes" does not tell us whether ASNA was entitled to payment.[11]

The Federal Circuit briefly discusses the ISDA's statement that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization." Arctic Slope Native Ass'n, 629 F.3d at 1304 (quoting 25 U.S.C. § 450j-1(b)). But the court does not grapple with the logical impossibility of complying with this provision in the event of insufficient funding. See Arctic Slope Native Ass'n, 629 F.3d at 1304-05. Regardless of the manner in which the Secretary chooses to allocate less than full CSC funding among the tribes and tribal contractors, some tribes will be paid at the expense of others. See Ramah Navajo Sch. Bd., 87 F.3d at 1354 (Silberman, J., dissenting). That is, the plaintiffs' preferred allocation method and the government's pro rata method result in exactly the same level of compliance with § 450j-1(b).

Arctic Slope Native Association also attempts to distinguish Ferris because the Ferris contract did not include a "subject to the availability of appropriations clause." Arctic Slope Native Ass'n, 629 F.3d at 1303-04. The Federal Circuit concluded that this

---

[11] The dissent replicates this error. It would hold that Ramah's contractual obligation depends on "the availability of sufficient appropriations to pay for contract-support costs on all the Secretary's ISDA contracts." (Dissenting Op. 28 (emphasis added).) But this is precisely the theory of "mutual self-awareness among tribal contractors" rejected in Cherokee. 543 U.S. at 640.

-35-

clause was inserted into contracts to overcome the rule of Ferris. Arctic Slope Native Ass'n, 629 F.3d at 1303. This conclusion is curious in light of the Supreme Court's repeated citations to Ferris in Cherokee. See 543 U.S. at 637, 640, 641, 643. In particular, we cannot square the Federal Circuit's conclusion with the Court's reliance on both Ferris and Lincoln for the proposition that "if the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment even if the agency has allocated the funds to another purpose or assumes other obligations that exhaust the funds." Cherokee, 543 U.S. at 641 (quotation omitted, citing Lincoln, 508 U.S. at 192; Ferris, 27 Ct. Cl. at 546). By citing Lincoln's discussion of unfettered agency discretion in allocating an appropriation among objects for which an appropriation is legally available, 508 U.S. at 192, and Ferris's rule that a "contractor who is one of several persons to be paid out of an appropriation" cannot have "his legal rights . . . affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects," 27 Ct. Cl. at 546, the Court strongly suggested that the Ferris rule applies to lump sum appropriations even if the contracts for which the appropriation is legally available contain "subject to the availability of appropriations" clauses.[12]

---

[12] One other circuit decided the issue presented in the same manner as the Federal Circuit. See Ramah Navajo Sch. Bd. v. Babbitt, 87 F.3d 1338, 1345 (D.C. Cir. 1996). And the Federal Circuit previously held consistently with Arctic Slope Native Association. See Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't, 194 F.3d 1374, 1378 (Fed. Cir. 1999). Both of these prior cases, however, predate Cherokee, and neither mentions Ferris. Because neither case contains a persuasive analysis of Cherokee or Ferris, which are strongly probative if not controlling, and because the reasoning in those

Continued . . .

-36-

Finally, we note that <u>Arctic Slope Native Association</u> suggested a third potential general rule regarding the effect of "subject to the availability of appropriations" clauses with respect to lump-sum appropriations. <u>See</u> <u>Arctic Slope Native Ass'n</u>, 629 F.3d at 1305 n.8. The court cites <u>Winston Bros. Co. v. United States</u>, 130 F. Supp. 374 (Ct. Cl. 1955), a Court of Claims trial court decision which held "where the agency authorized to spend the appropriation allocates the funds on a rational and non-discriminatory basis and they prove insufficient, the Government is not liable for harm resulting from the shortage." <u>Id.</u> at 380. Under this interpretation, an agency's disbursement of a lump-sum appropriation could render an appropriation unavailable, but only if the agency's allocation is irrational or discriminatory. But as the Federal Circuit seemed to recognize, <u>Arctic Slope Native Ass'n</u>, 629 F.3d at 1305 n.8, such an interpretation is flatly inconsistent with <u>Lincoln</u>'s holding that an agency's discretionary allocation of a lump-sum appropriation is non-reviewable. 508 U.S. at 191-92.

V

For the foregoing reasons, we conclude that a "subject to the availability of appropriations" clause frees the government of liability only when congressional decisions standing alone—not discretionary agency actions—make funds unavailable for a specific contract. As the <u>Cherokee</u> Court made clear, we must be hesitant to stray from the usual definition of "subject to the availability of appropriations" without very good

cases is very similar to that of <u>Arctic Slope Native Association</u>, we do not address them separately.

reason. It is "important to provide a uniform interpretation of similar language used in comparable statutes, lest legal uncertainty undermine contractors' confidence that they will be paid, and in turn increase the cost to the Government of purchasing goods and services." Cherokee, 543 U.S. at 644. Nevertheless, in exceptional cases, courts have given the phrase unique import. In Blackhawk Heating & Plumbing Co. v. United States, 224 Ct. Cl. 111 (1980), the court was faced with one such "convincing argument for a special, rather than ordinary, interpretation," Cherokee, 543 U.S. at 644.

In Blackhawk, the government and plaintiff entered into a settlement agreement intended to resolve disputed claims with respect to the construction of a Veterans Administration hospital. 224 Ct. Cl. at 115-16. As is common, the government's obligation was made "contingent upon the availability of appropriated funds from which payment in full can be made." Id. at 118. Unlike the case at bar, however, the government presented substantial evidence regarding the negotiation of the agreement, and the parties' understanding of specific terms. The parties and their attorneys engaged in several discussions of the above-quoted contingency, and at the execution of the settlement agreement, the government's attorney explained that "if there were an affirmative action by the Congress that would prevent the Administrator from paying," the government's obligation would not attach. Id. at 120. The plaintiff shrugged and signed the agreement. Id. Later, Congress did take affirmative action to prevent payment of a portion of the settlement agreement. Id. at 123. Based on the powerful parol evidence of the parties' intent, the court interpreted the ambiguous contingency term to

free the government from liability.  Id. at 134.

In Arctic Slope Native Association, the Federal Circuit cited another case in which a court deviated from the traditional rule:  C. H. Leavell & Co. v. United States, 530 F.2d 878 (Ct. Cl. 1976).  See Arctic Slope Native Ass'n, 629 F.3d at 1303.  That case considered a contract with a lengthy appropriations condition that, like Blackhawk, may have provided a reason to stray from the general rule. The contract at issue in C. H. Leavell contained a subsection (b) indicating that "[f]rom funds heretofore appropriated, the sum of $ 75,000.00 is available for payments to the Contractor."  530 F.2d at 894.  It further stated:

> [if] it becomes apparent to the Contracting Officer that the balance of this allocation and any allocation for this and any subsequent fiscal years during the period of this contract is less than that required to meet all payments due and to become due the Contractor because of work performed or to be performed under this contract, the Contracting Officer may provide additional funds for such payments if there be funds available for such purpose.  The Contractor will be notified in writing of any additional funds so made available.  However, it is distinctly understood and agreed that the amount of funds stated in (b) above is the maximum amount the Government insures will be available during the current fiscal year and the Government is in no case liable for payments to the Contractor beyond this amount prior to having notified the Contractor in writing of any additional funds that can be made available.  Accordingly, no progress schedule will be approved . . . which contemplates progress requiring funds in excess of the amounts stated to be available in (b) above for the current fiscal year and no progress schedule will be approved for any ensuing fiscal year which contemplates progress requiring funds in excess of the amount allocated by the Contracting Officer from funds subsequently made available.

Id.  The C. H. Leavell contract may have conditioned the contractor's entitlement on the discretionary decisions made by the contracting officer based on the repeated references

to the officer's allocations.  In this case, the government does not point to any language suggesting the plaintiffs agreed to be bound by the Secretary's choices.

Indeed, the government does not identify any compelling factors that would militate in favor of straying from the usual rule here.  Nothing in the self-determination contracts or the AFAs that appear in the record unambiguously dictate the government's position; they merely repeat the phrase "subject to the availability of appropriations," or similar terms such as "subject to the availability of funding."  One provision in the 2001 AFA requires Oglala to bill the BIA in an amount discounted by the actual CSC funding rate.  But this provision is nothing more than an acknowledgment that the BIA would not provide full funding in that year, not an indication that the tribes were agreeing to limit the government's liability.[13]

The Ramah 2000 AFA is more illuminating.  It includes an explicit acknowledgement that whether the tribe would receive funding for prior years' shortfalls was an open question.  By 2000 and 2001, the Oglala and Ramah contractors knew the BIA would not pay their costs in full during the relevant fiscal year, but as a Ramah plaintiff representative explained by affidavit, her tribe "always understood that the contract amount represents an entitlement under the Self-Determination Act, even if

_____

[13] Perhaps even this much cannot be read into the billing provision.  The most logical reading is that it is simply referring to the 75 percent to be paid up front by the BIA, established earlier in the agreement.  The earlier reference is followed by the promise that the "balance of funds will be added as soon as it becomes available subject to congressional appropriation."

payment is delayed until Congress makes the necessary appropriation." Unlike the shrug of the shoulders by the contractor in Blackhawk, Ramah has been vigorously shaking its head for over a decade now.[14]

The government also argues that Cherokee is distinguishable from this case and a "special" reading is required because Congress indicated its intent to underfund CSCs across the board. See Cherokee, 543 U.S. at 634 ("The Government refers to legislative history, but that history shows only that Executive Branch officials would have liked to exercise discretionary authority to allocate a lump-sum appropriation too small to pay for all the contracts that the Government had entered into; the history does not show that Congress granted such authority." (citation omitted)). The government contends that, here, the allocation of too small a lump-sum to fund all CSCs was an affirmative act by Congress indicating its intent to curtail full payment of valid CSCs. Although the legislative history suggests some congressional concern with the growth of CSCs,[15] see H.R. Conf. Rep. No. 103-299, at 28, the inference drawn by the government is too weak to overcome the strong preference for giving words a consistent meaning in order to

---

[14] The dissent repeatedly suggests that the tribes knew or should have known that they would not receive full CSC funding. (Dissenting Op. 28, 29, 32.) The former contention is contradicted by tribal officials' statements in the record. The latter is unsupportable in light of the principles of appropriations and contracts law discussed herein.

[15] For an investigation into the efficiency of tribal utilization of CSCs, see Bureau of Indian Affairs and National Congress of American Indians, Report of the BIA/Tribal Work Group on Tribal Need Assessment (June 1999).

ensure stability of government contracting.  See Cherokee, 543 U.S. at 644; Dougherty, 18 Ct. Cl. at 503.

This is particularly true in light of the canons discussed supra.  The traditional rule is that parties are presumed to contract with knowledge of existing law.  See, e.g., In re Doctors Hosp. of Hyde Park, Inc., 337 F.3d 951, 959 (7th Cir. 2003); Williams v. Stone, 109 F.3d 890, 896 (3d Cir. 1997);  Storts v. Hardee's Food Sys., Nos. 98-3285 & 98-3320, 2000 U.S. App. LEXIS 6307, at *45 (10th Cir. Apr. 6, 2000) (unpublished); Gen. Accident Ins. Co. v. First Nat'l Bank & Trust Co. of Tulsa, Nos. 90-5259 & 91-5009, 1993 U.S. App. LEXIS 26789, at *13 (10th Cir. Oct. 12, 1993) (unpublished).  The reasonableness of the expectations of the parties must be viewed in light of the trust doctrine and the canon in favor of the tribes' construction, the Ferris rule, the traditional meaning of "legal availability," and the Cherokee Court's interpretation of identical language.  We hold that the tribes' interpretation of the contracts and the statute is quite reasonable.

## VI

Lastly, we address the government's appeal to the Appropriations Clause and the Anti-Deficiency Act.  The Anti-Deficiency Act provides:

An officer or employee of the United States Government . . . may not—

(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or]

(B) involve [the] government in a contract or obligation for the

-42-

payment of money before an appropriation is made unless authorized by law . . . .

31 U.S.C. § 1341(a)(1). The government claims that these provisions bar the Secretary from paying total CSCs, and that they strip the United States of liability to individual contractors above the contractor's pro rata share. We agree with the first proposition, but disagree with the second.

As to liability, the ISDA permits the Secretary to enter into self-determination contracts prior to Congress appropriating funds, although the contracts are made subject to the availability of appropriations. The statute explicitly provides that "[t]he Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof." 25 U.S.C. § 450f(a)(1). The ISDA further states that "the provision of funds under this Act is subject to the availability of appropriations." § 450j-1(b). The model contract portion of the ISDA, § 450*l*, indicates that self-determination contracts "become effective upon the date of the approval and execution by the Contractor and the Secretary," and repeats the "[s]ubject to the availability of appropriations" language with respect to funding amount. Id. (model contract § (b)(2), (4)).

Reading these provisions together, it is clear that the Secretary is "authorized by law" to "involve [the] government in a contract or obligation for the payment of money before an appropriation is made." 31 U.S.C. § 1341(a)(1)(B). The "subject to the

availability of appropriations" language would be rendered meaningless unless the contract was signed prior to congressional appropriations. Of course, the United States' liability is made contingent upon the availability of appropriations, but as discussed above, that condition was satisfied in each of the years at issue because Congress appropriated enough funds to pay CSCs on any individual contract. See Part IV, supra.

We agree with the government that the appropriations bills prohibit the Secretary from paying the sum total of all CSCs from the agency appropriations. But the United States' liability is not coterminous with the Secretary's ability to pay. As explained in Dougherty, the Anti-Deficiency Act restrains "the official, but [it does] not affect the rights in this court of the citizen honestly contracting with the Government." 18 Ct. Cl. at 503 (citing the original Anti-Deficiency Act, Rev. Stat. § 3679).

This brings us to the Appropriations Clause, which states: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. 1, § 9, cl. 7. If the plaintiffs' CSCs cannot be paid from the annual agency appropriations, the government argues, how can plaintiffs collect without violating the Appropriations Clause? The answer is straightforward: By recovering from the Judgment Fund established pursuant to 31 U.S.C. § 1304. See 25 U.S.C. § 450m-1(d) (Contracts Disputes Act applies to self-determination contracts); 41 U.S.C. § 612 (a) (judgments arising under Contract Disputes Act paid from Judgment Fund).

The government contends that Congress could not have intended this inefficient system of compensation. On one level, it is true that Congress likely did not intend to

-44-

pay CSCs from the Judgment Fund. But we must consider the legal effect of Congress' intentional acts, and those acts compel the result. Congress passed the ISDA, guaranteeing funding for necessary CSCs, and its appropriations resulted in an on-going breach of the ISDA's promise. The Court in Cherokee recognized the possible remedy urged by plaintiffs, noting that agencies faced with insufficient appropriations must sometimes exhaust the appropriation and "leav[e] the contractor free to pursue appropriate legal remedies [including the Judgment Fund] arising because the Government broke its contractual promise." 543 U.S. at 642-43 (citations omitted).[16]

This result leaves Congress with several options to avoid liability. See U.S. Gen. Accounting Office, Indian Self Determination Act: Shortfalls in Indian Contract Support Costs Need to be Assessed 54-63 (1999) (discussing potential congressional solutions to the CSC shortfall dilemma). Congress can revise the ISDA to remove the guarantees of full CSC funding contained in 25 U.S.C. § 450j-1(a)(1) and (g). See N.Y. Airways, Inc. v. United States, 177 Ct. Cl. 800, 808 (1966) (cited with approval in Cherokee, 543 U.S. at 642) (Congress could avoid liability caused by insufficient appropriations "by

_____

[16] The government also argues that the Judgment Fund is not an appropriate remedy because the Secretary will be required to reimburse the fund for any judgment resulting from a self-determination contract. But this argument ignores the full text of the reimbursement provision, which requires an agency to reimburse the fund "out of available funds or by obtaining additional appropriations for such purposes." 41 U.S.C. § 612(c) (emphasis added); see also 2 GAO Redbook at 6-41 to 42 ("If an agency finds itself [unable to pay a contract], unless it has transfer authority or other clear statutory basis for making further payments, it has little choice but to seek a deficiency or supplemental appropriation from Congress, and to adjust or curtail operations as may be necessary." (footnote omitted)).

changing the substantive law under which the [contractual obligation was set], rather than by curtailing appropriations"). Alternatively, Congress could limit appropriations on a contract-by-contract basis. See Dougherty, 18 Ct. Cl. at 503 ("[W]hen one contract on its face assumes to provide for the execution of all the work authorized by an appropriation, the contractor is bound to know the amount of the appropriation, and cannot recover beyond it . . . ."). What the government cannot do is breach its contractual obligations and avoid liability based on an improper reading of the phrase "subject to the availability of appropriations."[17]

## VII

For the foregoing reasons, we **REVERSE** the grant of summary judgment in favor of the government and **REMAND** for further proceedings consistent with this opinion.

---

[17] Plaintiffs raise additional arguments, several of which are considered in the dissent. (See Dissenting Op. 12-15, 39-42.) Although we do not disagree with much of that discussion, we need not reach the remaining issues given our holding as to the meaning of the phrase "subject to the availability of appropriations."

08-2262 - *Ramah Navajo Chapter v. Salazar*

**HARTZ**, Circuit Judge, dissenting:

I respectfully dissent. There is much in the majority opinion with which I agree. And the result advocated by the government is not easy to swallow—the BIA hands over programs to tribal organizations but then does not reimburse the organizations for the full costs of running the programs. But in my view congressional intent is clear, all parties should have understood (and indeed did understand) that intent, and we must construe the contracts at issue in accordance with that understanding. The majority opinion's approach strikes me as too formalistic in relying on a sharp division between line-item and lump-sum appropriations. It renders futile the spending cap imposed by Congress. And to the extent that the majority opinion relies on *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005), for support, it fails to explain why the Supreme Court found it necessary to address in its opinion so many issues that would be irrelevant if the Court had embraced the view of government contracts that the majority opinion adopts.

## I.    BACKGROUND

The majority opinion provides a thorough discussion of the relevant statutory and administrative background. In this section I will focus on the statutory context and a few facts that illuminate the parties' necessary understanding of their contractual relationship.

First, beginning in fiscal year 1994, Congress set a maximum limit on how much the BIA could allocate from its budget for contract-support costs (termed "indirect costs" in that appropriations act, and "contract-support costs" thereafter). This was a change from prior-year appropriations, which had provided a designated amount for contract-support costs but had not prohibited the BIA from supplementing that amount with unrestricted funds available in the remainder of the appropriation to the BIA. (The appropriations-bill language at issue in *Cherokee Nation* was essentially the same as in the pre-1994 BIA appropriations.) Ordinarily, there would be no great difficulty in an agency's complying with such a spending cap. The agency could simply refuse to enter into more contracts than it had the money to pay for. But that course was unavailable to the BIA under the ISDA. If a tribal organization wished to take over an eligible program from the BIA, the BIA had to relinquish its control and fund the organization's takeover, except in quite limited circumstances. *See* 25 U.S.C. § 450f(a)(2).[1] And the BIA's contract with the tribal organization to fund the program could not exclude contract-support costs. *See id.* § 450j-1(a). The congressional limitation on contract-support costs could therefore be effectuated by the BIA only by refusing to pay costs that would otherwise be mandated by statute. In other words, when Congress capped contract-support expenditures, it

_____

[1]I should note, however, that for fiscal year 1999, Congress prohibited new or expanded ISDA contracts. *See* Pub. L. No. 105-277, § 328, 112 Stat. 2681, 291-92.

necessarily understood that the cap must override what would otherwise have been statutory commands to pay contract-support costs in full on each contract mandated by the ISDA.

Second, there was no secret that the BIA planned to pay only a portion of contract-support costs on each ISDA contract. As set forth in the majority opinion, some months after enactment of each of the relevant appropriations bills, the BIA would publish a notice in the Federal Register stating the amount of contract-support appropriations that it had received and explaining the allocation method should that amount be insufficient to pay for all contract-support costs negotiated in its ISDA contracts. The notice for fiscal year 1994 also forecast the magnitude of the potential shortfall in contract-support funding:

> Using FY 1993 experience which resulted in a total CSF [contract-support fund] need of approximately $85,000,000, we project a shortfall of at least $10,000,000 in FY 1994 and possibly a shortfall as high as $25,000,000. It is important to restate that the Bureau can only utilize the amount appropriated for the CSF account to meet indirect cost needs. That is, the Bureau can no longer reprogram funds from other Bureau accounts to cover CSF shortfalls.

58 Fed. Reg. at 68694. Notices in later years did not project the amount of shortfalls; but their language (indeed, their very purpose) warned tribal organizations of the possibility of insufficient funding.

All notices described essentially the same method for distributing contract-support funds in the event of a shortfall. A specified sum (or nothing at all, *see* 64 Fed. Reg. at 2659 (fiscal year 1999)) was set aside for new or expanded

contracts; such contract-support funds were usually to be distributed on a first-come, first-served basis. *See, e.g.*, 62 Fed. Reg. at 1470 (fiscal year 1997). For ongoing or existing contracts, in the event of a shortfall "the amount available shall be distributed pro rata, so that all contractors and compactors receive the same percentage share of their reported need." 66 Fed. Reg. at 15276 (fiscal year 2001).

The notices further advised that the BIA would not distribute the tribal organizations' final contract-support payments until about July 31, well after they were supposed to have begun performance under their contracts.[2] In practice, the tribal organizations often were not told precisely how much each would be paid in contract-support funds until late September. Between fiscal years 1994 and 2001, the tribal organizations were paid 77% to 92% of their contract-support costs.[3]

---

[2]*See, e.g.*, 59 Fed. Reg. at 55318 (fiscal year 1995); 63 Fed. Reg. at 5399 (fiscal year 1998); 66 Fed. Reg. at 15276 (fiscal year 2001). *But see* 58 Fed. Reg. at 68694 (notice for fiscal year 1994, stating that the final distribution of contract-support funds will be made "around May 1").

[3]It is worth noting that even if there had been no statutory cap on contract-support costs, full payment would likely not have been made until well after performance of the contract had begun. The contract-support costs were typically expressed as a percentage of an agreed-on base amount rather than in dollar terms. The percentage—called the indirect-cost rate—was negotiated with the Inspector General of the Department of the Interior. *See* 25 U.S.C. § 450b(g) ("'indirect cost rate' means the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency"); S. Rep. No. 100-274, *as reprinted in* 1988 U.S.C.C.A.N. at 2628 ("Tribal indirect cost rates are negotiated and approved according to OMB guidelines by the Department of Interior Office of Inspector General."). The product of that rate

(continued...)

The AFAs recognized that contract-support costs might not be fully paid.

Although the template for AFAs may have changed over the years and the AFAs

in the record may not be representative in various respects, they are illustrative of

how tribal organizations and the BIA dealt with the tentativeness of contract-

support funding. The Oglala AFA for calendar year 2001 is quite explicit. Its

section entitled "Program and Budget" includes the following paragraph:

> . Contract Support Funds shall be provided by the Bureau of Indian
> Affairs, *subject to the availability of funding*, in accordance with the
> Indirect Cost Negotiation Agreement between the Contractor and the
> Office of the Inspector General, and in accordance with Bureau of
> Indian Affairs policies and procedures pertaining to the distribution
> of Contract Support Funds.

J. App., Vol. IV at 900 (emphasis added). A paragraph entitled "Billings for

Indirect Cost" in the "Administration Data" section explicitly recognizes that

_____

[3](...continued)
and the base amount is intended to be the best approximation of what the indirect
contract-support costs are. *See* 2 C.F.R. pt. 225 (OMB Guidelines). The
negotiation to establish the indirect-cost rate was ordinarily conducted after
execution of the AFA. Ramah's controller explained:

> Our indirect cost rates are usually not determined by agreement until
> well after the commencement of the federal fiscal year and
> sometimes not until after it is concluded. The principal reason is that
> indirect cost proposals must be accompanied by single agency audits
> for the year ending two years prior to the fiscal year for which the
> application is being made. However, in practice it has proven
> impossible for us to finalize our audits prior to the commencement of
> the federal fiscal year in question.

J. App., Vol. II at 266–67.

Oglala may be reimbursed for only a percentage of the indirect contract-support

costs computed by using the indirect-cost rate. It states:

> The contractor shall bill for Indirect Cost earned on his voucher\invoice showing the following, for the period covered by the voucher\invoice:
> 1. Total direct cost expenditures.
> 2. Less Exclusions.
> 3. Times Indirect Cost Rate.[4]

---

[4]The preceding paragraph, which is entitled "Negotiated Indirect Cost Rates," describes how the parties are to arrive at a rate:

1. The allowable indirect costs under this contract shall be obtained by applying negotiated indirect cost rates to bases agreed upon by the parties, as specified below.
2. Negotiation of indirect cost rates by the Contractor and the cognizant audit agency shall be undertaken as promptly as practicable after receipt of the Contractor's indirect cost proposal.
3. Allowability of cost and acceptability of cost allocation methods shall be determined in accordance with OMB Circular A-87.
4. The results of each negotiation shall be set forth in an Indirect Cost Negotiation Agreement, such agreement shall become a part of this contract by reference. The agreement shall specify:
   (a) The agreed indirect cost rate(s);
   (b) The base to which to the rate(s) apply;
   (c) The periods for which the rate(s) apply; and,
   (d) The specific items treated as exclusions or any changes in the items previously agreed to be treated as exclusions.
5. The Contractor is to be reimbursed for all allocable and allowable indirect costs incurred in performance of this contract, subject to any statutory limitations applicable.
6. Any failure by the parties to agree on any indirect cost rate(s) or applicability of the rate(s) to the bases under this provision shall be considered a dispute concerning a question of fact for decision by the Awarding Official within the meaning of the

(continued...)

-6-

4. *Times percentage of rate funded by BIA.*
5. Indirect Cost earned for the period covered.
(1) – (2) X (3) X (4) = (5).

*Id.* at 920 (emphasis added). In other words, the full amount of indirect contract-support costs will be reduced by multiplying it by a "percentage of rate funded by BIA." This computation follows the same steps as those for indirect-contract-support-cost computations set forth in the BIA's notice of "Distribution of Fiscal Year 2001 Contract Support Funds." *See* 66 Fed. Reg. at 15276.

Not only were the tribal organizations on notice that contract-support costs may not be fully funded, but their representatives may even have acquiesced in the shortfall, recognizing that in light of limited willingness of Congress to fund programs benefitting Native Americans, other needs should take priority over contract-support costs. A study by the GAO reported that there were two reasons for underfunding contract-support costs:

> First, it is difficult for [the BIA and the Indian Health Service] to predict what the total need for indirect cost funding will be in advance. The agencies do not know which tribes will be contracting which programs, at what level the contracted programs will be funded, and what a tribe's indirect cost rates will be. Second, in addition to the difficulty of predicting the future contract support requirements, the agencies have had other funding priorities in recent years. For example, BIA's priorities have been to seek additional appropriations for law enforcement to reduce crime on the reservations and for Indian education.

[4](...continued)
   clause of the contract entitled "Disputes".

J. App., Vol. IV at 919–20. The indirect-cost rate is not an issue in this appeal.

J. App., Vol. III at 541. Those priorities are to be set after consultation with the Native American community. *See* 25 U.S.C. § 450j-1(i) ("On an annual basis, the Secretary shall consult with, and solicit the participation of, Indian tribes and tribal organizations in the development of the budget for the . . . Bureau of Indian Affairs (including participation of Indian tribes and tribal organizations in formulating annual budget requests that the Secretary submits to the President for submission to Congress . . .).").[5]

Another good indication that everyone understood, or should have understood, that the appropriations cap would require reductions in contract-support payments in all the BIA's ISDA contracts can be found in a brief submitted some 16 years ago by one of the law firms representing Plaintiffs in this appeal. In *Ramah Navajo School Board., Inc. v. Babbitt*, 87 F.3d 1338 (D.C.

---

[5]It is also worth noting that the contracts give tribal organizations the right to suspend performance if they become insecure about payment:

> The Contractor shall not be obligated to continue performance that requires an expenditure of funds in excess of the amount of funds awarded under this Contract. If, at any time, the Contractor has reason to believe that the total amount required for performance of this Contract or a specific activity conducted under this Contract would be greater than the amount of funds awarded under this Contract, the Contractor shall provide reasonable notice to the appropriate Secretary. If the appropriate Secretary does not take such action as may be necessary to increase the amount of funds awarded under this Contract, the Contractor may suspend performance of the Contract until such time as additional funds are awarded.

25 U.S.C. § 450*l*(c) (Model Agreement § 1(b)(5)).

Cir. 1996), the school board successfully challenged how the Secretary of the Interior apportioned to the tribes the restricted contract-support appropriations for fiscal year 1995. (The plaintiffs in that case did not challenge, as in this case, the failure to pay full contract-support costs.) The Secretary had set a June 30, 1995, deadline for submitting proposals for indirect-cost rates. Tribal organizations that missed the deadline would receive only 50% (instead of 75%) of full funding on the first round of distribution. *See* 59 Fed. Reg. at 55318 (fiscal year 1995). In the second round the remaining funds would be apportioned pro rata to the deadline-compliant tribal organizations, who ultimately received more than 90% of full funding. *See Ramah Navajo Sch. Bd.*, 87 F.3d at 1343. The brief submitted by counsel for the school board asserted: "Congress in the [ISDA] and the contemporaneous appropriation statutes clearly intend[ed] an even, across-the-board reduction in all tribal contracts in the event of an appropriations shortfall." Appellant's Brief at 27, *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, Nos. 95-5334, 95-5348) (D.C. Cir. Nov. 15, 1995) (footnote omitted).

## II. ANALYSIS

Given the obvious intent of Congress, which was communicated by the BIA to tribal organizations receiving ISDA funds and was surely understood by them, affirmance of the district court is required unless some legal doctrine overrides congressional intent. In my view, however, the governing doctrine confirms the need for affirmance.

## A.    Congressional Appropriations and Government Contractual Liability

The Appropriations Clause of the United States Constitution states, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. 1, § 9, cl. 7. To prevent the Executive from forcing its hand by incurring contractual debts on behalf of the United States, Congress has enacted the Anti-Deficiency Act which, with certain limited exceptions, prohibits federal agencies from contracting for more than what Congress appropriates. *See* 31 U.S.C. § 1341(a)(1)(A), (B). The Act states in part:

> An officer or employee of the United States Government . . . may not—
>> (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or]
>> (B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law . . . .

*Id.* § 1341(a)(1). Consequently, government contracts generally are not binding until Congress appropriates the necessary funds. *See Cherokee Nation*, 543 U.S. at 643.

On occasion, however, a law may grant a government officer or employee what is known as "contract authority"—that is, the authority to enter into a contract that is binding regardless of whether Congress appropriates sufficient money to cover the contract. *See Train v. City of New York*, 420 U.S. 35, 39 n.2

-10-

(1975); *see generally* I General Accounting Office, Principles of Federal Appropriations Law p. 2-6 (3d ed. 2004) (GAO Redbook). In that event, if the appropriation turns out to be inadequate, the contractor can sue the government for underpayment. *See* GAO Redbook at p. 2-7. A grant of contract authority, however, must be clear. As stated in 31 U.S.C. § 1301(d): "A law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made."

Plaintiffs make two principal arguments in support of their claim to full payment of ISDA contract-support costs: They assert (1) that the Secretary had contract authority to bind the government to pay contract-support costs regardless of the sufficiency of appropriations, and (2) that even if the Secretary lacked contract authority, the congressional appropriation for contract-support costs was sufficient for each separate contract, so that the government is bound even if there were insufficient funds to pay the total of such costs for all ISDA contracts. I first address contract authority.

### B. Did the BIA have Contract Authority for Contract-Support Costs?

Plaintiffs contend that Congress granted the Secretary contract authority to enter into ISDA contracts when it directed the Secretary to pay in full the

contract-support costs on ISDA contracts (regardless of the adequacy of appropriations for those costs). They acknowledge the following language of 25 U.S.C. § 450j-1(b) that limits the provision of funds to what is appropriated:

> *Notwithstanding any other provision in this subchapter* [the entire ISDA]*, the provision of funds under this subchapter is subject to the availability of appropriations* and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

(Emphasis added). They argue, however, that this language does not limit the government's financial obligation for contract-support costs.

To begin with, Plaintiffs remind us that the ISDA's legislative history reflects congressional intent that tribes not be penalized by government underpayment of contract-support costs. *See* S. Rep. 100-274, *as reprinted in* 1988 U.S.C.C.A.N. at 2628 ("the Committee believes strongly that Indian tribes should not be forced to use their own financial resources to subsidize federal programs."). They then point to two ISDA provisions suggesting a categorical government obligation. The first is § 450j-1(a)(2), which states:

> There *shall* be added to the amount required by paragraph (1) [(the Secretarial amount)] contract support costs which *shall* consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—
>
> > (A) normally are not carried on by the respective Secretary in his direct operation of the program; or

(B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

(Emphases added).  The other is § 450j-1(g) (added to the ISDA six years after enactment of the subject-to-availability language of § 450j-1(b)), which speaks of contract-support costs as an entitlement:

Upon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is *entitled* under subsection (a) of this section, subject to adjustments for each subsequent year that such tribe or tribal organization administers a Federal program, function, service, or activity under such contract.

(Emphasis added).[6]  In light of this mandatory language, Plaintiffs contend that the subject-to-availability restriction on "the provision of funds under this subchapter," § 450j-1(b), must limit only payments by the Secretary, not the government's ultimate liability.  Under their construction of the statute, "*payment of the full amount by the Secretary is subject to available appropriations to make

_____

[6]In addition, Plaintiffs rely on § 450j-1(d)(2), which states:  "Nothing in this subsection shall be construed to authorize the Secretary to fund less than the full amount of need for indirect costs associated with a self-determination contract."  But this provision explicitly applies only to subsection (d) of § 450j-1. *See id.* § 450j-1(d)(1) ("Where a tribal organization's allowable indirect cost recoveries are below the level of indirect costs that the tribal organizations should have received for any given year pursuant to its approved indirect cost rate, and such shortfall is the result of lack of full indirect cost funding by any Federal, State, or other agency, such shortfall in recoveries shall not form the basis for any theoretical over-recovery or other adverse adjustment to any future years' indirect cost rate or amount for such tribal organization, nor shall any agency seek to collect such shortfall from the tribal organization.").  The provision does not purport to have any effect on the subject-to-availability language of § 450j-1(b).  Thus, I fail to see any relevance of § 450j-1(d)(2) to the present dispute.

-13-

those payments, but if such appropriations are not available then the underpaid contract *obligation* remains in place and the government remains liable in damages." Aplt. Br. at 49–50.

Plaintiffs' argument is interesting, but unpersuasive. They do not explain why there would be any reason to include in the ISDA a provision saying that the Secretary cannot pay out money that has not been appropriated. Such a provision would seem superfluous. If such payments are not barred by the Constitution's Appropriations Clause, then the Anti-Deficiency Act should do the trick. One could also wonder what good Congress thought it would accomplish by restricting payments by the Secretary but not the liability of the government. The effect on the overall federal budget would be the same whether the money comes from the Secretary's budget or from the fund used to pay judgments for the government's breach of contractual duties. *See* 31 U.S.C. § 1304 (judgment fund). When Congress says that "the provision of funds under this subchapter [the ISDA] is subject to the availability of appropriations," 25 U.S.C. § 450j-1(b), it must mean that the government's *obligation* on ISDA contracts is limited by the amount appropriated.

As for the addition of § 450j-1(g) several years after enactment of the subject-to-availability language in § 450j-1(b), if subsection (g) were intended to limit the reach of that language in subsection (b), one would expect Congress to have been explicit about it, as required by 31 U.S.C. § 1301(d) (contract authority

-14-

must be "specifically state[d]").  Yet Congress did not bother to amend § 450j-1(b) to say that the subject-to-availability provision that otherwise applies to the entire ISDA does not apply to contract-support costs.

Most importantly, Plaintiffs' construction of the subject-to-availability provision is contrary to the Supreme Court's view.  Referring to § 450j-1(b), *Cherokee Nation* said:

> Language of this kind is often used with respect to Government contracts.  This kind of language normally makes clear that an agency and a contracting party can negotiate a contract prior to the beginning of a fiscal year but that the contract will not become binding unless and until Congress appropriates funds for that year.  *It also makes clear that a Government contracting officer lacks any special statutory authority needed to bind the Government without regard to the availability of appropriations.*

543 U.S. at 643 (citations omitted; emphasis added).  I therefore conclude that the Secretary did not have contract authority to bind the government to pay full contract-support costs regardless of the adequacy of appropriations.

I now turn to Plaintiffs' argument that there were available funds to pay each tribal organization's contract-support costs in full.

### C.     Were Funds Available for Full Payment of Contract-Support Costs?

Plaintiffs' principal argument is not predicated on the Secretary's alleged contract authority to bind the government to pay contract-support costs in full.  Rather, they contend that sufficient appropriations were "available" to pay each individual tribal organization's contract-support costs in full, so the government

cannot escape liability by relying on the insufficiency of appropriations to pay the total of such costs for all tribal organizations. Aplt. Br. at 1.

Before addressing the decisions relied upon by Plaintiffs, I would note two classic Supreme Court opinions on the enforceability of unfunded contracts. They establish that a contractual subject-to-availability provision ordinarily forecloses recovery of otherwise promised payment in excess of appropriations; that is, by agreeing that payment is subject to the availability of appropriations, the contractor accepts the risk of congressional underfunding.

*Bradley v. United States*, 98 U.S. 104 (1878), concerned the lease of a building for government use. In accordance with statutes barring federal agencies from entering into contracts for amounts exceeding appropriations, *see id.* at 107–08, the three-year lease stated that it was "subject to an appropriation by Congress for the payment of the rental herein stipulated for, and that no payment shall be made to [Bradley] on account of such rental until such appropriation shall be available," *id.* at 105–06 (internal quotation marks omitted). During the first two full years of the lease term, Congress appropriated $4,200, the full contract price, specifically for the lease; but in the last year it appropriated only $1,800. *See id.* at 108 (the first-year appropriation also included rental for the first three weeks of the lease, which were in the prior fiscal year). The Court rejected the claim for the balance by Bradley's successor. It said that the parties' intent, as evidenced by the lease's availability provision, was that the lessor would not be

-16-

paid until appropriations became available. *See id.* at 112. That provision placed

the underfunding risk on the lessor:

> Public officers, . . . having no funds in the treasury and being without
> authority to bind the United States, can only agree to pay the
> stipulated rental, provided the money is appropriated by Congress,
> and if the lessor, voluntarily and without any misrepresentation or
> deception, enters into a lease on those terms, he must rely upon the
> justice of Congress.

*Id.* at 117.

*Sutton v. United States*, 256 U.S. 575 (1921), teaches a similar lesson. The

government contracted with the Hillsboro Dredging Company (whose assets were

later assigned to Sutton as bankruptcy trustee) to conduct dredging and excavation

work for a harbor-improvement project. *See id.* at 577. Hillsboro was to be paid

at unit rates. *See id.* Congress appropriated $23,000 for the project. *See id.*

"The appropriation was ample to defray the cost at [the agreed-on unit] rates,

assuming that the quantities of material to be removed did not greatly exceed the

estimates presented by the specifications." *Id.* A statute limited the

government's contractual obligations to the amount of appropriations. *See id.* at

579 ("'No act of Congress hereafter passed shall be construed to authorize the

execution of a contract involving the payment of money in excess of

appropriations made by law, unless such act shall in specific terms declare an

appropriation to be made or that a contract may be executed.'" (quoting 34 Stat.

697, 764 (1906); ellipses omitted)). Accordingly, the contract provided that

"within the limits of available funds the United States reserves the right to require the removal of such yardage as will complete the work, be it more or less than the quantities above estimated." *Id.* at 577 (ellipses and internal quotation marks omitted). When it was discovered that the government inspector had underestimated the amount of work performed, work was halted. *See id.* But by that time the amount owed at unit rates substantially exceeded the congressional appropriation. *See id.* Sutton sued for the balance. *See id.* at 578. The Court held that "the contractor cannot recover for work done in excess of the appropriation." *Id.* at 581. "The Secretary of War was . . . without power to make a contract binding the government to pay more than the amount appropriated. Those dealing with him must be held to have had notice of the limitations upon his authority." *Id.* at 579.

Plaintiffs argue that *Bradley* and *Sutton* are distinguishable because they concern only "restricted single-purpose appropriations" in which Congress has "designate[d] a specifically-appropriated sum for a given undertaking." Aplt. Br. at 28. This case, they say, concerns instead a "lump-sum appropriation[]," *id.*, which, although "capped at some level," is "without limitation available for multiple projects or contractors . . . and is thus 'unrestricted,'" *id.* at 30. They contend that "[i]n the lump-sum situation . . . , an agency's exhaustion of an appropriation without fully paying the contract at issue . . . does not bar the contractor from recovering damages for the non-payment." *Id.* at 26–27

(emphasis omitted).  In other words, "the government may be held liable for failing to pay a contractor in full out of an appropriation sufficient to pay that contractor, even though the appropriation is insufficient to pay all of the contracts the agency has made." *Id.* at 27.

For support of their position, Plaintiffs rely in part on the Supreme Court's decision in *Cherokee Nation*, 543 U.S. 631, which awarded the plaintiffs in that case their full contract-support costs for ISDA contracts with the Secretary of Health and Human Services (HHS).  I will discuss *Cherokee Nation* more fully later.  For now, suffice it to say that the holding in that case is not helpful to Plaintiffs' argument.  True, the contracts were, as here, subject to the availability of appropriations.  *See id.* at 640–41.  And, as here, the government argued that Congress did not appropriate enough money to cover the full contract-support costs for all ISDA contracts.  *See id.* at 636.  But unlike our case, the appropriations acts had not used restrictive not-to-exceed language with respect to contract-support costs.  (The acts were like the pre-1994 BIA appropriations acts.)  Thus, the HHS Secretary's contract-support spending was not statutorily restricted.  And because there were sufficient unrestricted funds (in addition to the funds specifically appropriated for contract-support costs) available to cover the contract-support costs on the HHS Secretary's ISDA contracts with the plaintiffs, the Court held that the subject-to-availability provision did not limit the government's liability.  *See id.* at 643 ("Since Congress appropriated adequate

unrestricted funds here, [the] phrase ['subject to the availability of appropriations'], if interpreted as ordinarily understood, would not help the Government."). To be sure, Plaintiffs here rely not just on the holding in *Cherokee Nation* but also on some of the Court's language regarding the government's liability on contracts paid for out of lump-sum appropriations. Before I turn to that language, however, it will be helpful first to analyze other relevant case law and to review the specific context of the dispute before us.

Most helpful to Plaintiffs is the holding in a lower-court decision cited with approval by *Cherokee Nation*. In summarizing propositions not disputed by the parties in that case, the Supreme Court cited *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892), for its statement that "[a] contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects." *Cherokee Nation*, 543 U.S. at 637–38. Plaintiffs argue that under this *Ferris* doctrine, each tribal organization is entitled to full payment of its contract-support costs because the congressional appropriation for contract-support costs was many times greater than their individual amounts, and it is irrelevant to any particular tribal organization that the Secretary may have overcommitted the total appropriation by entering into other contracts. In my view, however, this argument takes *Ferris* too far.

*Ferris* considered a contract between the government and Ferris to dredge 100,000 cubic yards of material from the Delaware River. *See* 27 Ct. Cl. at 542–43, 545. When the contract was executed, the agency allotted to it $37,000 out of a congressional appropriation for improvement of the river. *See id.* at 542–43. But the government halted work when only 35,494 cubic yards of material had been removed because the appropriation had been exhausted. *See id.* at 545–46. Ferris was fully paid $9,500 for the work performed; but he sought lost profits for the work that he was prevented from performing by the order to stop. *See id.* at 543, 545–46. The court awarded him $6,510 in damages. *See id.* at 547. Exhaustion of appropriated funds, it explained,

> justified the officer in charge, but does not justify the [government] in not providing funds for carrying out and discharging [its] legal obligations. *A contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects.* An appropriation *per se* merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties.

*Id.* at 546 (emphasis added).

This quoted proposition might appear to control the result here. After all, each tribal organization executing an ISDA contract would know that the congressional appropriation for contract-support costs was far more than sufficient to cover those costs for its own contract, and the organization would

-21-

not be "chargeable with knowledge of [the] administration [of that appropriation], nor c[ould] [its] legal rights be affected or impaired . . . by its diversion . . . to other objects." *Id.*

But one must not read too much into *Ferris*. It is, in essence, simply a case about contract interpretation. The legality of the contract was not at issue. Nor was there any doubt that the officer in charge was forbidden from making additional payments to Ferris once the appropriation was exhausted; the court noted that the officer was "justified" in stopping the work. *Id.* The sole question was the extent to which the government was bound on its contract with Ferris. To answer that question, courts follow the dictum that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (internal quotation marks omitted). Context, of course, is critical in interpreting contracts. What *Ferris* said is that in the circumstances of that case, where the government contracted to pay for certain work and sufficient funds to pay for the work had been appropriated (and even allocated to the contract), then the contractor could take the contractual promise as binding; the contractor did not need to worry about whether the funds would be reallocated while it was performing the contract. This would have been a reasonable assumption by the parties; and ordinarily it

would be a reasonable construction of such a contract even if it contained subject-to-availability-of-appropriations language.  *See Cherokee Nation*, 543 U.S. at 637.

In other contexts, however, a court could properly interpret similar language differently.  The effect of context is well-illustrated by the opinion of the Court of Claims in *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539 (1980), an opinion cited repeatedly by the Supreme Court in *Cherokee Nation*.  It is worthwhile to describe *Blackhawk* in detail.  The case concerned an agreement between the Veterans Administration (VA) and a contractor to resolve a dispute regarding cost overruns for construction of a hospital.  *See id.* at 541.  The parties settled on a compromise payment of $10.3 million.  *See id.*  The amount was to be paid in two installments:  $8 million within 40 days of settlement, and $2.3 million within 90 days of settlement.  *See id.* at 544.  To pay the settlement, the VA needed to transfer ("reprogram") funds that had been earmarked for other projects.  *See id.* at 542.  This was done, and the VA then sent letters notifying some congressional committees (those involved in VA appropriations) of the reprogramming.  *See id.* at 543.  But several members of Congress, after reviewing a GAO report on the settlement, wrote to the VA expressing concern about the payments.  *See id.* at 544.  When the VA decided to go forward with the settlement anyway, Congress enacted legislation retroactively barring any VA settlements exceeding $1 million absent an independent audit (which had not been prepared for the Blackhawk settlement), although the

conference report on the legislation agreed that up to $6 million could be advanced on settlements that predated the law's effective date. *See id.* at 544–45. The law was enacted on January 3, 1974; and on the same day the VA paid $6 million of the initial $8 million installment required by the settlement, about three weeks after it was due. *See id.* at 543, 545. The VA made no further payments. *See id.* at 546.

Blackhawk sued the VA for the unpaid settlement amounts plus interest. *See id.* The lawsuit turned on the meaning of Article 8 of the agreement, which stated: "The Government's obligation hereunder is contingent upon the availability of appropriated funds from which payment in full can be made." *Id.* at 542 (internal quotation marks omitted). The parties agreed on the meaning to some extent. They both thought that Article 8 at least made the agreement contingent on the VA's reprogramming funds initially earmarked for other construction purposes, although it was everyone's understanding that the contingency was highly likely to occur. *See id.* at 542–43, 546–47.

The VA contended, however, that Article 8 further limited its liability in two ways: (1) its obligation was contingent on approval of the reprogramming by congressional committees notified of it beforehand, *see id.* at 546–47, and (2) it was conditioned on there being no "affirmative action by the Congress that would prevent the [VA] from paying," *id.* at 550. After examining the relevant statutory and regulatory framework, the parties' course of dealing, and communications

between the parties, the court disagreed with the VA on the first limitation but agreed on the second.

In rejecting the VA's claim that Article 8 made payment to the contractors conditional on approval of reprogramming by the pertinent congressional committees, the court observed that no statute required such approval, no VA regulation stated that reprogramming would not go forward without congressional-committee consent, and no practice or policy of the VA prohibited unconsented-to programming. The court said that notification to the committees was merely a courtesy to maintain good relations with Congress. Moreover, it found that no one representing the VA had ever told Blackhawk that committee approval was necessary for reprogramming, and in none of the prior settlement agreements between Blackhawk and the VA had committee approval of reprogramming been raised as a consideration. *See id.* at 547–50.

As for the VA's contention that Article 8 made payment conditional on Congress's not acting to prevent payment, the court found the issue a close one, but sided with the VA. Crucial to this conclusion was evidence of what happened at the meeting to execute the settlement. At the meeting a VA attorney mentioned that Article 8 would limit the government's liability should Congress affirmatively prevent the agency from paying. *See id.* at 543. To this statement the contractor merely shrugged and said nothing. *See id.* The parties then signed

the agreement. *See id.* The court said that the contractor's shrug "was both an acknowledgment of understanding and a dismissal of concern." *Id.* at 551.

The court's ultimate ruling gave each party a partial victory. Article 8 relieved the VA of liability on the second installment of $2.3 million, which came due after Congress enacted the legislation limiting the VA's settlement payments; but the VA remained liable on the balance of the first installment of $8 million because it came due before the legislative enactment, when the agency had funds available with which to pay. *See id.* at 552–53.

For present purposes, the lesson of *Blackhawk* is that the court did not confine its analysis to the abstract meaning of "contingent upon the availability of appropriated funds"; it construed the language in light of the relevant statutes and (nonexistent) regulations, the policies and practices of the agency, and the communications between the parties.

Adopting this perspective, I now turn to Plaintiffs' ISDA contracts. First, consider the statutory context. As discussed above, congressional enactments alerted tribal organizations to the likelihood of shortfalls. The appropriation for every pertinent year set an upper limit on what could be provided for contract-support costs. Whereas in *Ferris* the government presumably could have avoided overcommitting its limited appropriation by refusing to execute additional contracts, the Secretary had no such discretion. The ISDA requires the Secretary (1) to approve all tribal requests to execute ISDA contracts (unless certain narrow

statutory grounds justify refusal), *see* 25 U.S.C. § 450f(a)(1), (2); and (2) to pay

(subject to the availability of appropriations) the full amount of contract-support

costs for each such contract, *see id.* § 450j-1(a)(2), (b). Because the amount of

contract-support costs was thus a matter over which the Secretary had essentially

no control, the only purpose for capping those costs would be to reduce them

below what would otherwise be required by the ISDA.

Moreover, the Secretary gave tribal organizations repeated official notices

that the restricted appropriations for contract-support costs had not been adequate

and were expected to be inadequate for full funding, so that contingency plans

had been made regarding how to apportion funds if they turned out to be

inadequate. An annual notice in the Federal Register advised that the BIA would

need to determine whether the appropriated funds for contract support would

suffice to pay contract-support costs for all ISDA contracts and, if not, the BIA

would pay only a pro rata portion of the costs. Every contracting organization

well knew that its contract-support costs had not been paid in full for the prior

year; and the notices would have had scant purpose had the BIA expected the

appropriation to be adequate. Thus, unlike Ferris, the tribal organizations knew

what to expect. I am not saying that giving notice can by itself relieve an agency

of an obligation to pay. If the money is there, the agency must pay, as in

*Cherokee Nation*. Rather, the point is that if legislation precludes full payment,

the contractor cannot rely on *Ferris* if the contractor has proper notice of the problem.

In short, even though a government contractor ordinarily may not be chargeable with knowledge of the administration of the appropriation that funds the contract, it cannot close its eyes to the clear implication of statutory funding restrictions, official information publicly promulgated on the subject, and the historical course of dealing. Whether an appropriation can be viewed as a line item or a lump sum is a relevant part of the context, but only a part. Given the context here, a reasonable person construing the AFAs at issue would understand that the Secretary was promising to pay only the portion of contract-support costs that could be funded by the restricted congressional appropriation for such costs on all ISDA contracts. To be sure, ambiguities in contracts with Indian tribes should be resolved in favor of the tribes. *See* 25 U.S.C. § 450*l*(c) (Model Agreement § 1(a)(2)). But that rule does not apply here because of the clarity of the meaning of "subject to the availability of appropriations" in the present context. That language means that the government's contract-support-cost obligation is subject to the availability of sufficient appropriations to pay for contract-support costs on all the Secretary's ISDA contracts.

My view is supported by three opinions of two other circuits regarding the availability of contract-support costs in light of the not-to-exceed language in the appropriation acts. Two opinions predate *Cherokee Nation*; but I see nothing in

-28-

them contrary to the Supreme Court's analysis. And what is most important about the decisions is not so much their ultimate conclusions as their construction of the legislation, which was what I have said would be the reasonable interpretation by a tribal organization entering into an ISDA contract with the BIA.

I have already mentioned *Ramah Navajo School Board*, 87 F.3d 1338. In that opinion the court interpreted the ISDA's subject-to-availability provision to mean that "each Tribe had a right only to the amount of CSF [contract-support funding] it would have received under a legal allocation plan." *Id.* at 1346. It then held that the allocation plan would be legal only if it were pro rata for all tribal organizations. *See id.* at 1349. It found support in "[t]he legislative history of the 1995 Act[, which] indicates that Congress, aware that it had appropriated an insufficient amount for full CSF funding, intended for the agency to deal with the shortfall through a *pro rata* reduction." *Id.* I agree that organizations contracting with the Secretary would have understood that none of them would receive full contract-support-cost funding if the restricted appropriation was insufficient to pay full costs for all of them. And, as I said earlier, the plaintiffs in *Ramah Navajo School Board* so understood the law. *See* Appellant's Brief at 27, *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, Nos. 95-5334, 95-5348 (D.C. Cir. Nov. 15, 1995).

In *Babbitt v. Oglala Sioux Tribal Public Safety Department*, 194 F.3d 1374 (Fed. Cir. 1999), the court addressed, and rejected, a claim seeking the same

relief as in our case—full payment of contract-support costs despite a not-to-exceed appropriation and a subject-to-availability proviso. The plaintiff raised an estoppel argument, asserting that it had detrimentally relied on § 450j-1(g)'s entitlement language. But the court said that it was unreasonable for the plaintiff to expect full payment of indirect contract-support costs because the subject-to-availability provisos in § 450j-1(b) and the model contract unequivocally informed it otherwise. *See id.* at 1380.

The third opinion, of course, is *Arctic Slope Native Assn'n, Ltd. v. Sebellius*, 629 F.3d 1296 (Fed. Cir. 2010). In a thoughtful opinion by the court most conversant with federal contract law, the identical issue raised in this case was resolved in favor of the government.

In sum, I conclude that in the context of the appropriation statutes for the years in question, the ISDA, and the parties' course of dealing, the subject-to-availability language of Plaintiffs' ISDA contracts meant that the contract-support costs for each would need to be reduced if the appropriation for contract-support costs was inadequate to pay such costs on all ISDA contracts.

I disagree with Plaintiffs' contention that the *Cherokee Nation* opinion requires otherwise. In that case the plaintiffs successfully sued for full payment of their contract-support costs for ISDA contracts with the Indian Health Service (IHS) (under the HHS Secretary) for fiscal years 1994 through 1997. *See Cherokee Nation*, 543 U.S. at 634. Congress had appropriated between $1.277

billion and $1.419 billion each year for the IHS "to carry out" the ISDA.  *Id.* at 637 (internal quotation marks omitted).  "These appropriation Acts contained no relevant statutory restrictions," *id.*, in contrast to appropriations to the BIA for ISDA purposes during those years, which contained caps on contract-support funding.

As Plaintiffs read *Cherokee Nation*, it stands for the proposition that because the appropriation for contract-support costs was more than adequate to pay those costs for any particular tribal organization, the subject-to-availability requirement was satisfied for each individual contract and the government is liable.  But, as I have previously noted, *Cherokee Nation* does not so hold.  In that case the available funds sufficed to pay the total of contract-support costs for all contracts at issue.

I must acknowledge, however, that the *Cherokee Nation* opinion did endorse the general proposition (which, the Court observed, the government had not contested) relied on by Plaintiffs—that "as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations,' even if the contract uses language such as 'subject to the availability of appropriations,' and even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made."  *Id.* Accordingly, said the Court, the government was bound in that case unless it

-31-

could "show something special about the promises . . . at issue," *id.* at 638,

keeping in mind the importance of "provid[ing] a uniform interpretation of . . .

language [similar to 'subject to the availability of appropriations'], lest legal

uncertainty undermine contractors' confidence that they will be paid, and in turn

increase the cost to the Government of purchasing goods and services," *id.* at 644.

But what compels a different outcome here is the presence of "something

special," *id.* at 638, that was not present in *Cherokee Nation*—namely, the context

discussed at length above to show that tribal organizations must have understood

that caps in the appropriation acts could (and almost certainly would) require a

percentage reduction in payment of contract-support costs.  Recall that the ISDA

does not give the Secretary discretion to refuse to enter into an ISDA contract or

to refuse to pay contract-support costs.  Thus, the language of the annual

appropriations acts that set a limit on the funds available for contract-support

costs could have no purpose other than to require underpayment of contract-

support costs in ISDA contracts.  And because the Secretary could not beggar one

tribal organization (by reducing its contract-support costs) to pay the full

contract-support costs for another organization, *see* 25 U.S.C. § 450j-1(b) ("[T]he

Secretary is not required to reduce funding for programs, projects, or activities

serving a tribe to make funds available to another tribe or tribal organization

under [the ISDA]."), Congress must have contemplated a reduction for all tribal

organizations.  Indeed, if we were to apply to the present context the *Ferris*

doctrine as interpreted by Plaintiffs, the dollar limitations in the appropriations acts would be empty gestures. Because the government would still owe full contract-support costs on each ISDA contract, the caps would be irrelevant. We should refrain from interpreting statutory language in a way that renders it impotent. *See Fed. Trade Comm'n v. Accusearch, Inc.*, 570 F.3d 1187, 1198 (10th Cir. 2009) ("Under a long-standing canon of statutory interpretation, one should avoid construing a statue so as to render statutory language superfluous." (internal quotation marks omitted)). I would adopt the more natural interpretation of the statutory scheme, which, as noted above, has been adopted in three other circuit opinions and even endorsed by the plaintiffs in one of the cases.

Moreover, *Cherokee Nation* does not preclude my interpretation. On the contrary, the discussion in that opinion of several arguments made by the government suggests that the Court was unwilling to endorse the rigid view of *Ferris* adopted by Plaintiffs here—namely, that so long as the appropriation for contract-support costs was greater than the amount of such costs in an individual ISDA contract, the subject-to-availability condition is not triggered and the government is liable. If *Cherokee Nation* had, as Plaintiffs contend, embraced their view of *Ferris*, it would have been unnecessary for the Court to address those arguments by the government; after all, the *Ferris* doctrine, as understood by Plaintiffs, would have guaranteed the Cherokee Nation's victory regardless of the merits of the other arguments. It is therefore instructive to examine some of

-33-

the grounds on which the Court rejected the government's arguments against applying the general *Ferris* rule in that case, because the things that the Court found missing in *Cherokee Nation* are present here.

First, in concluding that ISDA contracts should be treated like ordinary procurement contracts, the Court wrote that it had "found no indication that Congress believed or accepted the Government's current claim that, because of mutual self-awareness among tribal contractors, tribes, not the Government, should bear the risk that an *unrestricted* lump-sum appropriation would prove insufficient to pay *all* contractors." *Cherokee Nation*, 543 U.S. at 640 (emphasis added). Here, however, we confront *restricted* lump-sum appropriations that set a maximum expenditure for contract-support costs; and, perhaps more importantly, the context (as I have previously explained) unambiguously shows that Congress intended, and the tribal organizations were on notice and understood, that the restriction would reduce the contract-support costs to which each was otherwise entitled, thereby imposing on them the risk of an inadequate appropriation.

Second, the Court rejected the government's reliance on the language in § 450j-1(b) that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under [the ISDA]," because no such reduction was necessary. The Court observed that the plaintiff tribes' claims could be paid out of unrestricted funds that had gone for government, not tribal, operations. *See id.* at

641–42.  In stark contrast, here the funds necessary to pay one tribal organization's contract-support costs in full would have to come from money that would otherwise go to another contractor because of the appropriations cap on contract-support costs.

Third, the Court rejected the government's argument that the subject-to-availability language of § 450j-1(b) gave the Secretary "authority . . . to adjust funding levels based on appropriations"; it observed that the government could point to no supporting statutory language and that the legislative history merely showed that "Executive Branch officials would have liked to exercise discretionary authority to allocate a lump-sum appropriation too small to pay for all the contracts that the Government had entered into[, but] the history does not show that Congress granted such authority."  *Id.* at 643–44 (internal quotation marks omitted).  True, the appropriations caps in this case likewise do not confer discretion on the Secretary.  But what the Secretary sought *discretion* to do in *Cherokee Nation* is *compelled* here.  The Secretary is forbidden to use for contract support any funds in the BIA lump-sum appropriations above the capped amounts.

Fourth, and finally, the Court said that the government could not rely on a 1999 statute setting limits on contract-support costs based on earlier committee reports.  The statute said:

> Notwithstanding any other provision of law the amounts appropriated to or earmarked in committee reports for the Indian Health Service

-35-

for payments to tribes for contract support costs are the total amounts available for fiscal years 1994 through 1998 for such purposes.

*Id.* at 645 (brackets, ellipses, emphasis, and internal quotation marks omitted). The Court said that it would be reasonable to interpret this language to forbid payment to the plaintiff tribes; but it adopted another interpretation to avoid construing the statute as having a retroactive effect. In the case before us, however, restrictions in the appropriations acts are not being applied retroactively.

To be sure, *Cherokee Nation* does not definitively endorse the government's position in this case. But it certainly did not adopt Plaintiffs' position, either. If it had, the Supreme Court could have short-circuited much of its discussion by simply saying that the government's arguments were beside the point, because even granting all those arguments, there was certainly a sufficient appropriation to pay the contract-support costs of any single tribal organization. As just one example, it would not have had to decide whether to interpret the 1999 statute to apply retroactively, because the plaintiffs in that case would have prevailed anyway.

Accordingly, I reject Plaintiffs' contention that language in *Cherokee Nation*, even if not the holding, compels judgment in their favor.

I now turn to Plaintiffs' two remaining arguments that their ISDA contracts require full payment of their contract-support costs. One argument is that their

ISDA contracts incorporate the provisions of the ISDA; and because the ISDA requires full payment of contract-support costs, each contract does so as well.  I reject this argument because, as already explained at length, the ISDA does not require full payment.  Full payment is conditioned on the availability of funds. *See* 25 U.S.C. §§ 450j(c)(1), 450j-1(b).

Plaintiffs' other argument is that their construction of the ISDA contracts is compelled by an admission in a government brief in another case.  The issue in *Southern Ute Indian Tribe v. Leavitt*, 497 F. Supp.2d 1245 (D.N.M. 2007), was whether the IHS could be compelled to enter into a new ISDA contract with the Southern Utes even though all funds appropriated for contract-support costs for the year had already been contractually committed.  In a brief filed on December 19, 2005, the government made the following statements:  (1) "[T]he issue here is whether IHS is potentially liable for contract support costs once it signs on the dotted line.  Given the decision in *Cherokee* [*Nation*], IHS at a minimum was reasonable in its belief that by entering a new self-determination contract with plaintiff, it might be implicitly promising to pay contract support costs in excess of Congressional appropriations," J. App., Vol. VII at 1670 (Reply in Support of Defendants' Motion for Summary Judgment at 6, *Southern Ute*, 497 F. Supp. 2d 1245); (2) "According to the [Supreme] Court [in *Cherokee Nation*], the language [of 25 U.S.C. § 450*l*(c) (Model Agreement § 1(b)(4))] gave IHS 'no legal right to disregard its contractual promises,' even in the absence of available

appropriations," *id.* at 4; and (3) "Thus, contrary to [Southern Ute's] claim, defendants might be held liable for plaintiff's contract support costs despite the inclusion of the [subject-to-availability] clause in their contract," *id.* Plaintiffs contend that these statements amount to an admission that their interpretation of their ISDA contracts is plausible, even reasonable, and that therefore we must adopt that interpretation because of the rule that we interpret ambiguities in ISDA contracts in favor of the tribes. *See* 25 U.S.C. § 450*l*(c) (Model Agreement § 1(a)(2)).

I disagree. The contract-interpretation issue in *Southern Ute* was quite distinct from what confronts us. The context of the dispute was as follows: The IHS had informed the Southern Utes that there were no more funds available for contract-support costs. *See Southern Ute*, 497 F. Supp.2d at 1248–49. The IHS was willing to enter into a contract with the tribe for new services but only if the tribe waived its rights to contract-support costs. *See id.* at 1250. The tribe refused to execute a waiver. *See id.* The question then became whether the IHS could therefore refuse to enter into a contract with the tribe. *See id.* at 1252. The IHS was concerned that its executing the standard contract in that context would amount to a binding promise to pay contract-support costs despite the absence of appropriated funds to pay for those costs. *See id.* The quoted statements from the government's brief were to explain why the IHS was concerned. In my view, the context of the contract-interpretation issue before us is sufficiently different that

-38-

nothing in the government's *Southern Ute* brief amounts to a concession of

ambiguity regarding our issue.

> **D.      Are Plaintiffs Entitled to Recovery Because of Executive's
> Failure to Request Adequate Appropriation?**

Plaintiffs' final argument is that the government is liable for full payment

because the executive failed to request the needed funding from Congress.  They

rely on *S. A. Healy Co. v. United States*, 576 F.2d 299 (Ct. Cl. 1978).  The

holding in *Healy*, however, is quite fact-specific; and the general rule stated in the

opinion would not apply here.  In that case, Healy and the government executed a

fixed-price construction contract in November 1970, before Congress

appropriated funds.  *See id.* at 300–02.  The contract contained the following

subject-to-availability clause:

> Under the contract to be entered into under these specifications, the
> liability of the United States is contingent on the necessary
> appropriations being made therefor by the Congress and an
> appropriate reservation of funds thereunder.  Further, the
> Government shall not be liable for damages under this contract on
> account of delays in payments due to lack of funds.

*Id.* (internal quotation marks omitted).  The contract was also governed by the

Reclamation Project Act of 1939, which provided that "'the liability of the United

States [on its project contracts] shall be contingent upon appropriations being

made therefor.'"  *Id.* at 303 (quoting 43 U.S.C. § 388).

On December 22, 1970, Healy (as required by the contract) submitted a

proposed schedule of forecasted earnings that set forth, among other things,

-39-

$4,887,000 for fiscal year 1972. *See id.* at 301. The contracting officer approved this schedule in February 1971 and Healy promptly began construction. *See id.* Meanwhile, in late January 1971 the President sent his proposed budget to Congress; but he requested only $1,800,000 for Healy's contract for fiscal year 1972. *See id.* at 302. Not until July 1971 did the contracting officer notify Healy how much had been requested. *See id.* Healy protested that the requested amount was "'totally inadequate'" and, on inquiring about the possibility of a supplemental appropriation, was told that prospects were bleak. *Id.* Nevertheless, Healy decided to proceed to the extent possible and continued with construction until September 22, 1971, when funds were exhausted. *See id.* Three months later, Congress approved a supplemental appropriation request that provided enough money to cover Healy's earnings for fiscal year 1972. *See id.* In January 1972 the government notified Healy that more money was available, and construction resumed. *See id.*

Despite the contractual and statutory subject-to-availability provisions, the court awarded damages to Healy. *See id.* It reasoned that the contract did not unambiguously state that the contractor had to bear "the full risk of a funds shortage" when the shortage was the agency's fault; and it found that the government agency was at fault for not requesting a sufficient appropriation to pay the contractor. *Id.* at 304; *see id.* at 305. Consequently, the contractor was entitled to damages caused by the work stoppage between when appropriated

-40-

funds were exhausted and when a supplemental appropriation bill was enacted. *See id.* at 302, 307–08.

The court described its holding as a narrow one. It said that it was not suggesting that the "executive branch was contractually obligated to request from [Congress] appropriations adequate to fund continued performance." *Id.* at 307. Rather, it held

> only that (a) a contract will not be construed to throw all the cost and loss necessarily incident to such a decision on the contractor, and none of it on the party whose decision caused the loss, unless clauses of the contract require that result without ambiguity, and (b) . . . a government agency that claims a right to do this is under an implied obligation to assist its contractor, by timely and candid information to take the measures that the latter may deem best to diminish and mitigate its loss.

*Id.*

The situation presented on this appeal is quite distinguishable from the egregious conduct in *Healy*. Healy was not informed that it might be underpaid until well after the contract was executed and performance had begun. Indeed, the contracting officer approved the contractor's budget even though the President had already requested less than 40% of that sum from Congress, and the officer did not notify the contractor of that request for another five months. Here, in contrast, Plaintiffs do not dispute the government's contention that "the tribes have participated in annual budget consultations with BIA." Aplee. Br. at 48 n.16; *see* 25 U.S.C. § 450j-1(i) (requiring the Secretary to solicit tribes'

-41-

participation in formulating the BIA's budget requests).  And, as I have already explained, the statutory context and the historical course of dealing made it clear to tribal organizations that annual shortfalls were likely and that contract-support costs would be underpaid.

## III.    CONCLUSION

For the foregoing reasons, I respectfully dissent.